THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* BRIAN K. DUNLAP *et al.*, Defendants-Appellees.

Fifth District   No. 81—378

Opinion filed November 22, 1982.—Rehearing denied December 17, 1982.

Randy Patchett, State's Attorney, of Marion (Martin N. Ashley, of State's Attorneys Appellate Service Commission, and Robert C. Cook, research assistant, of counsel), for the People.

Paul T. Austin & Associates and Raymond Lawler, P.C., both of Marion, and Edward J. Kionka, of Carbondale, for appellees.

JUSTICE WELCH delivered the opinion of the court:
Defendants Brian Dunlap and Revel Freeman were charged by in-

formation in the circuit court of Williamson County with having committed an unlawful calculated criminal drug conspiracy, with unlawful manufacture of a controlled substance and with unlawful possession with intent to manufacture a controlled substance, in violation of Sections 405 and 401(a)(7) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, pars. 1405, 1401(a)(7)). The substance alleged to have been the subject of these offenses is psilocyn, a Schedule I hallucinogen. (Ill. Rev. Stat. 1979, ch. 56½, par. 1204(d)(15).) According to the testimony offered by the State at defendants' preliminary hearing, this substance was supposed to have been found in *Psilocybe* mushrooms alleged to have been seized from defendant Freeman's Carterville, Illinois, residence.

The defendants moved to dismiss these informations on various constitutional and statutory grounds. Following an evidentiary hearing and arguments of counsel, the court granted the motions. It held that the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1100 *et seq.*) violated defendants' due process rights as applied to the possession of *Psilocybe* mushrooms, because the statute did not specify which types of mushrooms were prohibited under that Act. The court also stated that the statute did not specifically proscribe possession of the mushrooms themselves, as opposed to the extracted psilocyn, and that the cultivation of *Psilocybe* mushrooms was not illegal under the definition of "manufacture" contained in section 102(z) of the Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1102(z)). From this order of dismissal, the People have appealed to this court pursuant to Supreme Court Rule 604(a)(1). (87 Ill. 2d R. 604(a)(1)).

This appeal presents four separate issues:

    (1)  Does the listing of psilocyn in section 204(d)(15) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1204(d)(15)) suffice to prohibit the possession of mushrooms which, in their natural state, contain psilocyn?

    (2)  If the Illinois Controlled Substances Act prohibits the possession of mushrooms which, in their natural state, contain psilocyn, then does the Act violate due process in failing to specify that mushrooms containing psilocyn are proscribed?

    (3)  Does the cultivation of a plant containing a controlled substance constitute the "manufacture" of that substance?

    (4)  Is the classification of psilocyn as a Schedule I substance arbitrary and thus violative of the principle of equal protection of the laws?

We consider these questions in the order presented above.

At trial, the defendants argued, and the trial court agreed, that

the Illinois Controlled Substances Act does not prohibit the possession of mushrooms containing psilocyn. In support of this result, defendants invite comparison with other portions of the Illinois Controlled Substances Act, as well as with provisions of the Cannabis Control Act. For example, the opium poppy and poppy straw, natural source of opium, are listed in Schedule II along with several forms of opium (Ill. Rev. Stat. 1979, ch. 56½, pars. 1206(b)(1)(1) through 1206(b)(1)(6), 1206(b)(3)), and coca leaves, the natural sources of cocaine, are prohibited along with several derivatives of those leaves. (Ill. Rev. Stat. 1979, ch. 56½, par. 1206(b)(4).) Also, the Cannabis Control Act proscribes possession of the *Cannabis sativa* plant and its seeds and resin. (Ill. Rev. Stat. 1979, ch. 56½, par. 703(a).) Defendants refer to the maxim of statutory construction known as *"expressio unius est exclusio alterius,"* or, the expression of one thing in a statute implies the exclusion of all others. (*People v. Caryl* (1977), 54 Ill. App. 3d 537, 369 N.E.2d 926.) Applying this maxim to the Illinois Controlled Substances Act, the defendants argue that the reference to these other natural sources of controlled substances, combined with the omission of *Psilocybe* mushrooms from the Act, implies that possession of these mushrooms is not illegal.

This reasoning has been employed in several Canadian cases. In *Regina v. Parnell* (1979), 51 Can. Crim. Cas. 2d 413, the defendant was charged under the Canadian Food and Drugs Act (Can. Rev. Stat. 1970, ch. F-27) with possession of a restricted drug listed in that Act, namely psilocybin. She was alleged to have possessed mushrooms which contained psilocybin. The British Columbia Court of Appeal held that the Food and Drugs Act, by failing to refer to mushrooms as well as psilocybin, could not be construed as prohibiting possession of the mushrooms. *Parnell* has been followed in other recent Canadian decisions. (*Regina v. Cartier* (1980), 13 Alta. 2d 164, 54 Can. Crim. Cas. 2d 32; *Re Coutu* (1981), 61 Can. Crim. Cas. 2d 149.) Defendants urge this court to reach the same result under the Illinois Controlled Substances Act.

However, the *Parnell, Cartier* and *Coutu* opinions are dependent upon the wording of the Canadian Food and Drugs Act, which we find quite dissimilar from that of the Illinois Controlled Substances Act. Section 41(1) of the Food and Drugs Act prohibits the possession of a "restricted drug" (Can. Rev. Stat. 1970, ch. F-27, sec. 41(1)), which is defined in section 40 as "any drug or other substance included in Schedule H" (Can. Rev. Stat. 1970, ch. F-27, sec. 40). One of the Schedule H substances is psilocybin or any salt thereof. According to Chief Justice Nemetz, it was the narrow definition of the term

"restricted drug" which persuaded him that "the mere possession of the substance psilocybin as an integral part of the natural plant cannot support a conviction for possession of a restricted drug ***." *Regina v. Parnell* (1979), 51 Can. Crim. Cas. 2d 413, 414.

As a comparison, Chief Justice Nemetz referred to the definition of "narcotic" in section 2 of the Canadian Narcotic Control Act as "any substance included in the schedule or anything that contains any substance included in the schedule." (Can. Rev. Stat. 1970, ch. N-1, sec. 2.) He noted that the first three paragraphs of the schedule to the Narcotic Control Act included the opium poppy, coca, and *Cannabis sativa*, as well as preparations and derivatives from those sources. He concluded that in enacting the Narcotic Control Act, "Parliament intended to prohibit the plant as well as the derivative drug." *Regina v. Parnell* (1976), 51 Can. Crim. Cas. 2d 413, 415.

That portion of Schedule I in the Illinois Controlled Substances Act which contains psilocyn lists "any material compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances." (Ill. Rev. Stat. 1979, ch. 56½, par. 1204(d).) The defendants argued at trial, although they have not done so on appeal, that the General Assembly did not intend to prohibit the possession of "any material" containing these substances because there is no comma between the words "material" and "compound" in this provision. Yet, no definition for the phrase "material compound" has been offered by the defendants, nor have we been able to discern what a "material compound" would be. As the People point out, the series of words "material, compound, mixture, or preparation" appears 12 times in the Schedules to the Illinois Controlled Substances Act, and in these occurrences, "material" is separated from "compound" by a comma 10 times (Ill. Rev. Stat. 1979, ch. 56½, pars. 1206(d), 1206(e), 1208(b), 1208(c), 1208(d), 1208(f), 1210(b), 1210(c), 1210(d), and 1210(e)), while the comma is omitted from that location only twice (Ill. Rev. Stat. 1979, ch. 56½, pars. 1204(d), 1204(e)). The current version of the Act has resolved any apparent inconsistency among these provisions (Ill. Rev. Stat. 1981, ch. 56½, pars. 1204(d), 1204(e)) by inserting a comma between "material" and "compound" in all 12 locations. While normally it is presumed that a legislative amendment is designed to effectuate a change in the law, that presumption may be overcome by the circumstances and substance of the amendment. (*People v. Youngbey* (1980), 82 Ill. 2d 556, 413 N.E.2d 416). Because, in construing the same words or phrases which occur in different parts of a statute, those words or phrases should be given the same meaning (*People v. Lutz* (1978), 73 Ill. 2d 204, 383 N.E.2d 171), we

believe that the General Assembly merely intended to clarify existing law. Consequently, a comma must be read between "material" and "compound" in sections 204(d) and 204(e) of the 1979 version of the Illinois Controlled Substances Act.

More importantly, however, the defendants argue that even the broad language purporting to include within Schedule I "any material *** which contains any quantity of *** psilocyn" cannot proscribe the possession of *Psilocybe* mushrooms without specifically mentioning this natural source of psilocyn. They direct our attention to the well-established rule that penal statutes are to be strictly construed. (*People v. Robinson* (1982), 89 Ill. 2d 469, 475, 414 N.E.2d 674.) Nonetheless, it must be cautioned that this rule of construction should not be so rigidly applied as to defeat the plainly expressed intent of the legislature. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31; *People v. Jones* (1981), 100 Ill. App. 3d 831, 426 N.E.2d 1214.) It is our opinion that the meaning of section 204(d) of the Illinois Controlled Substances Act is expressed without ambiguity. The words "any material *** which contains any quantity of *** psilocyn" mean exactly that—any such material is a Schedule I substance, and thus mushrooms which, in their natural state, contain psilocyn, are included in Schedule I. We find it difficult to see how the General Assembly could have used any more direct language than it employed.

Nor does the omission of mushrooms from the Illinois Controlled Substances Act mandate the construction of that statute urged by the defendants. The rule *"expressio unius est exclusio alterius"* is of assistance only where the meaning of a statute is ambiguous, because that maxim requires the interpretation of a statute by use of an implication. (*People ex rel. Moss v. Pate* (1964), 30 Ill. 2d 271, 195 N.E.2d 641; *People ex rel. County of Du Page v. Smith* (1961), 21 Ill. 2d 572, 173 N.E.2d 485.) Since the Illinois Controlled Substances Act is explicit in prohibiting "any material" containing psilocybin, the failure to mention mushrooms in that Act cannot negate that provision. We cannot exclude from the Illinois Controlled Substances Act by implication that which certainly falls into the broad category of any material containing a substance listed in section 204(d). To so hold would be to ignore the plain wording of that section.

Moreover, a statute should be construed so as to avoid an absurd result. (*People v. Bournes* (1977), 55 Ill. App. 3d 237, 370 N.E.2d 1230; *People v. Floom* (1977), 52 Ill. App. 3d 971, 368 N.E.2d 410.) At trial, the defendants introduced the testimony of Dr. Ronald Siegel, a psychopharmacologist and psychologist who has had considerable experience in research on psilocyn. Dr. Siegel stated that psilocyn is

taken predominantly by eating mushrooms which contain the substance. He noted that it is possible to produce psilocyn synthetically, but such a process "requires fairly sophisticated chemical apparatus" and demands the use of reagents that are difficult to work with. According to Dr. Siegel, the only company in the world which produced psilocyn, Sandoz Laboratories in Switzerland, stopped manufacturing it in 1966 and turned over much of its supplies to the United States government for distribution to researchers, which is where Siegel was able to obtain psilocyn for his work.

Dr. Siegel also testified that because *Psilocybe* mushrooms normally contain only .05% psilocyn by dry weight, it would take approximately 227,000 pounds of mushrooms, by dry weight, to produce 300 grams of psilocyn. He explained that the dry weight of the mushrooms would not be equivalent to their weight in an unaltered form, as the weight of a mushroom is primarily that of its water content.

This evidence convinces us that, were we to accept the construction of the statute urged by the defendants, an absurd result would indeed occur. Psilocyn would be prohibited in a manufactured form, which involves a process beyond the capabilities of the "bathroom or kitchen chemist," as Dr. Siegel commented. It would also be prohibited in a refined form, which requires the extraction of miniscule amounts of psilocyn from massive quantities of mushrooms. Yet, the most common source of the substance, the mushrooms themselves, would be perfectly legal, as would the taking of psilocyn by ingestion of the mushrooms. We cannot believe that the General Assembly intended such a haphazard and ineffectual ban on psilocyn, especially given the reference in the Illinois Controlled Substances Act to any material containing psilocyn. Instead, we hold that, by adopting that statute, as it is worded, the legislature meant to prohibit possession of mushrooms which, in their natural state, contain psilocyn.

The next question posed by this appeal is, given that the Illinois Controlled Substances Act outlaws possession of mushrooms, does that act violate due process by failing to give adequate notice of the criminality of that conduct? This issue involves two separate arguments. First, the Act violates the due process rights of a person who possesses mushrooms which he knows to contain psilocyn, because it does not give fair warning that that possession is illegal. Second, the Act violates the due process rights of a person who possesses mushrooms containing psilocyn without knowing that they contain psilocyn, because the Act does not specify which mushrooms are illegal.

The trial court agreed with the defendants that the Act did not give any indication that possession of mushrooms was illegal. As such,

the court concluded that the Act violated the due process rights of individuals who possess mushrooms knowing them to contain psilocyn. The Florida Supreme Court decided similarly in a prosecution under a statute (Fla. Stat. sec. 893.01 *et seq.* (1975)), which, like the Illinois Controlled Substances Act, is based upon the Uniform Controlled Substances Act (9 Uniform Laws Annotated 197 (1970)). In a 4-3 decision in *Fiske v. State* (Fla. 1978), 366 So. 2d 423, the court reversed the defendant's conviction for the possession of psilocybin, a Schedule I substance also contained in *Psilocybe* mushrooms. The majority reasoned that if the Florida Drug Abuse Act would specify that psilocybin is contained in certain identifiable mushrooms, listing those mushrooms, then the Act would be constitutional as applied to a defendant charged with possession of mushrooms containing psilocybin. The court continued:

> "The statute as presently framed, however, gives no information as to what plants may contain psilocybin in its natural state. More particularly, the statute does not advise a person of ordinary and common intelligence that this substance is contained in a particular variety of mushroom. The statute, therefore, may not be applied constitutionally to appellant. It does not give fair warning that possession of the mushrooms possessed by appellant is a crime." 366 So. 2d 423, 424.

█ It is not argued that the proposed application of the Illinois Controlled Substances Act imposes upon first amendment rights, and thus whether the statute would be unconstitutionally applied in this case depends upon whether it meets two criteria. First, the statute must not be so vague that persons of ordinary intelligence must guess at its meaning, and, second, it must provide definite standards for law enforcement officers and triers of fact so that its application does not depend upon personal interpretations. (*People v. Garrison* (1980), 82 Ill. 2d 444, 412 N.E.2d 483, *appeal dismissed* (1981), 450 U.S. 961, 67 L. Ed. 2d 610, 101 S. Ct. 1475; *Grayned v. City of Rockford* (1972), 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294.) To meet these requirements, the language used in the statute must convey a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. (*People v. Clark* (1979), 71 Ill. App. 3d 381, 389 N.E.2d 911.) This inquiry requires an examination of that language as well as the legislative purpose behind the enactment and any relevant judicial interpretations of the statute. (*People v. Kleffman* (1980), 90 Ill. App. 3d 1, 412 N.E.2d 1057; *People v. Dednam* (1973), 55 Ill. 2d 565, 304 N.E.2d 627.) A statute enjoys a presumption of constitutionality. *People v. Schwartz* (1976), 64 Ill. 2d

275, 356 N.E.2d 8, *cert. denied* (1977), 429 U.S. 1098, 51 L. Ed. 2d 545, 97 S. Ct. 1116.

■ Under these established principles of constitutional law, the decision in *Fiske* is erroneous. While conceding that the Florida Drug Abuse Act, like the Illinois Controlled Substances Act, "explicitly controls any material which contains psilocybin and makes possession of the material a felony," (366 So. 2d 423, 424; Fla. Stat. sec. 893.03(1)(c)(18) (1970)), the *Fiske* majority nonetheless held, by implication, that the only natural reading of the phrase "any material" would be limited to a controlled substance "in capsule, pill or similar form." (366 So. 2d 423, 424.) In our view, this is an overly restrictive and artificial interpretation of that language. In fact, the term "material" is more commonly used to refer to an item which is the source for something else rather than a finished product (see Webster's Third New International Dictionary 1392 (1971)), and thus, as we have suggested earlier, a person of ordinary intelligence would be amply apprised by section 204(d) of the Illinois Controlled Substances Act that possession of *Psilocybe* mushrooms is illegal. As applied to one possessing mushrooms known to contain psilocyn, the Illinois Controlled Substances Act is not unconstitutional.

The trial court indicated that the Act did not specify which mushrooms contained psilocyn, and, by implication, it decided that the Act violated due process as applied to an individual who possessed *Psilocybe* mushrooms without knowing that they contained psilocyn. Initially, we doubt that these defendants have standing to raise this issue, because, in considering a motion to dismiss the informations, we must assume the truth of the allegations in the informations (*cf. People ex rel. Clark v. McCurdie* (1966), 75 Ill. App. 2d 217, 220 N.E.2d 318), which means, in this case, that we must accept that the defendants possessed the mushrooms, knowing them to contain psilocyn. The People contend that, in ruling on defendants' motion, the court erroneously decided a factual issue by stating that the defendants did not know that the mushrooms contained psilocyn. However, a reading of the comments of the court, in their entirety, shows that such a determination was not made.

■ Even if we concede that the defendants may raise this issue, though, it does not present any doubts of the constitutionality of the Illinois Controlled Substances Act. An individual who cultivated or otherwise possessed *Psilocybe* mushrooms without knowing them to contain psilocyn would not be prosecuted successfully under that statute, because in a prosecution for the possession or sale of controlled substances, the State must prove that a defendant had knowledge of

the nature of the substance possessed or sold. (*People v. Bussie* (1968), 41 Ill. 2d 323, 243 N.E.2d 196, *cert. denied* (1969), 396 U.S. 819, 24 L. Ed. 2d 70, 90 S. Ct. 56; *People v. Castro* (1973), 10 Ill. App. 3d 1078, 295 N.E.2d 538.) This knowledge requirement meets the objection that the Illinois Controlled Substances Act punishes without warning an offense of which the accused was unaware. (*Screws v. United States* (1945), 325 U.S. 91, 89 L. Ed. 1495, 65 S. Ct. 1031; *Colautti v. Franklin* (1979), 439 U.S. 379, 58 L. Ed. 2d 596, 99 S. Ct. 675.) We conclude therefore that the Illinois Controlled Substances Act's prohibition of the possession of mushrooms containing psilocyn does not violate the due process rights of either those who possess the mushrooms knowing them to contain psilocyn, or those who possess them unaware of their characteristics.

 Although the trial court expressly premised its dismissal of the informations on the constitutional grounds discussed above, the court also noted in passing that the mere cultivation of the mushrooms did not constitute "manufacture" of a controlled substance as prohibited in section 401 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1401). The People have argued, at trial and before this court, that this construction of the Act is erroneous, and we agree. Section 102(z) of the Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1102(z)) defines "manufacture" as

> "the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly, by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling of its container ***."

"Production" or "produce" means the "manufacture, planting, cultivating, growing, or harvesting of a controlled substance." (Ill. Rev. Stat. 1979, ch. 56½, par. 1102(oo).) It has been stated that, by itself, the definition of "manufacture" might suggest that that term refers only to extraction, chemical synthesis or a combination thereof, but when read with the definition of production, it is apparent that the growing of plant matter containing a controlled substance is prohibited. (*Boring v. State* (Miss. 1978), 365 So. 2d 960, 961, *cert. denied* (1979), 442 U.S. 916, 61 L. Ed. 2d 283, 99 S. Ct. 2835; see also *Bedell v. State* (1976), 260 Ark. 401, 541 S.W.2d 297, *cert. denied* (1977), 430 U.S. 931, 51 L. Ed. 2d 775, 97 S. Ct. 1552.) We believe that this construction of the Illinois Controlled Substances Act is imperative according to its terms.

■ The final issue in this case was not resolved by the trial court, but appropriate evidence was presented by the defendants, and the argument was made both at the trial level and in this court. It is whether the classification of psilocyn as a Schedule I substance is so arbitrary as to violate equal protection. The criteria for the inclusion of a substance in Schedule I are whether "(1) the substance has high potential for abuse; and (2) the substance has no currently accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision." (Ill. Rev. Stat. 1979, ch. 56½, par. 1203.) The defendants concede that psilocyn has no known medical use in the United States, so, keeping in mind the reference to a "high potential for abuse," we must determine "[i]f any state of facts may reasonably be conceived which would justify the classification" of psilocyn as a Schedule I controlled substance. *People v. McCabe* (1971), 49 Ill. 2d 338, 341, 275 N.E.2d 407, 409; *People v. McCarty* (1981), 86 Ill. 2d 247, 427 N.E.2d 147.

The hallucinogenic properties of certain mushrooms have long been a matter of common knowledge in several native American cultures. In Mexico, these mushrooms, in addition to being ingested in aid of religious ritual, also took on a symbolic character. (P. Furst, Hallucinogens and Culture 75-88 (1976).) Contemporary interest in these varieties of mushrooms may be traced to anthropological studies of surviving "mushroom cults" in Mexico, which studies were begun in the 1950's, as well as to the first extraction of pure psilocybin from the mushrooms themselves in 1958. F. Brown, Hallucinogenic Drugs 81-83 (1972); B. Wells, Psychedelic Drugs 52-53 (1973).

The physiological effects of psilocyn were described at trial by Dr. Siegel, who, as noted above, has done research on psilocyn under laboratory conditions. He testified that the substance generally begins to affect the subject within 15 minutes to one-half hour after ingestion. It has been said that the first half-hour following the ingestion of the companion substance psilocybin is "rather unpleasant and typified by dizziness, nausea and anxiety" and the next half-hour includes "further somatic effects such as sweating and ataxia." (B. Wells, Psychedelic Drugs 53 (1973).) It begins to excite electrical activity in the brain, it can alter breathing patterns somewhat, and it may change the subject's blood pressure. The pupils of the subject frequently become dilated, as may the blood vessels of the skin and neck, producing a flushed appearance. Dr. Siegel has recorded a skin temperature drop of up to 3° (F) in his subjects. These physiological symptoms usually disappear four hours after ingestion, by which time the presence of psilocyn in the blood and tissues of the body has dropped to

an immeasurable quantity. Dr. Siegel remarked that a dosage of 3 to 4 milligrams of psilocyn could be toxic, while it would probably take 20 or 30 milligrams to constitute a lethal dose.

As a result of his investigations, Dr. Siegel concluded that psilocyn is not a dangerous drug. He stated that psilocyn was not physically addictive because one does not build up a tolerance to it, and because there are no withdrawal symptoms which occur when a psilocyn user ceases to take the substance. Dr. Siegel also contended that, because the psilocyn experience is not as intensely euphoric and short-lived as that produced by heroin or cocaine, it is not likely to produce psychological dependence.

The defendants urge us to adopt the position taken by Dr. Siegel and find that the classification of psilocyn as a Schedule I substance is irrational. They point to the criteria which have been established for the Illinois Dangerous Drugs Commission in determining the appropriate classification of a controlled substance and argue that, under these guidelines, psilocyn should not be placed in Schedule I. Those criteria are:

"(1) the actual or relative potential for abuse;

(2) the scientific evidence of its pharmacological effect, if known;

(3) the state of current scientific knowledge regarding the substance;

(4) the history and current pattern of abuse;

(5) the scope, duration, and significance of abuse;

(6) the risk to the public health;

(7) the potential of the substance to produce psychological or physiological dependence;

(8) whether the substance is an immediate precursor of a substance already controlled under this Article;

(9) the immediate harmful effect in terms of potentially fatal dosage; and

(10) the long-range effects in terms of permanent health impairment." (Ill. Rev. Stat. 1979, ch. 56½, par. 1201(a).)

The defendants contend that Dr. Siegel's testimony establishes that psilocyn is not harmful according to the factors mentioned in categories (6) through (9), and that its properties in the other categories do not justify its classification in Schedule I.

The Illinois Controlled Substances Act is based on the Uniform Controlled Substances Act. The Uniform Act places psilocyn, along with other major hallucinogenic agents such as LSD, mescaline, peyote, DMT, DET and STP in its Schedule I. The Commissioners rea-

soned that, in addition to having no accepted medical use in the United States, these hallucinogens "have a high potential for abuse." Commissioners' note to Section 203, Uniform Controlled Substances Act, 9 Uniform Laws Annotated 197 (1970).

We cannot find this assessment of these substances to be arbitrary and irrational. The main characteristic which unites the hallucinogens is the alteration of the perception of the user. (See V. Uelmen and G. Haddox, Drug Abuse and the Law 77-80 (1974); Note, *Hallucinogens*, 68 Colum. L. Rev. 521 (1968).) Although the specific effects of a substance such as psilocyn vary according to the user and according to the circumstances under which the psilocyn is taken (Panton and Fischer, *Hallucinogenic Drug-Induced Behavior Under Sensory Attenuation*, 28 Archives of Gen. Psychiatry 434 (1973)), some generalizations can be made. As Dr. Siegel testified, individuals often initially feel a sense of euphoria, which gives way to a distortion of perception. Siegel stated that blurred vision occurs, accompanied by a more vivid perception of colors. Sounds may be "seen" and colors may be "heard"; this effect is known as synesthesia. While sources disagree concerning the frequency of hallucinations, in which the individual sees objects which are not there, it is apparent that they do occur. More common appear to be alterations of the individual's perception of space and time relationships. This, according to Dr. Siegel, would seriously affect a person's ability to judge distances.

As Dr. Siegel testified, there are several possible adverse psychological reactions to psilocyn. First, an individual may feel a sense of panic with all of the sensory changes which the substance tends to induce. Second, a temporary psychosis may be produced in someone who is not psychologically well balanced. Dr. Siegel stated that he knew of no evidence to suggest that psilocyn led to any long-term mental effects, but it should be noted that Dr. Siegel's research was performed under laboratory conditions on subjects who were selected because they were psychologically stable. Other case studies have indicated that longer lasting psychological complications can be produced. (See Hyde, Glancy, Omerod, Hall and Taylor, *Abuse of Indigenous Psilocybin Mushrooms: A New Fashion and Some Psychiatric Complications*, 132 Brit. J. of Psychiatry 602 (1978).) We acknowledge, however, that the research on this and other effects of psilocyn is not plentiful. McDonald, *Mushrooms and Madness: Hallucinogenic Mushrooms and Some Psychopharmacological Implications* 25 Can. J. of Psychiatry 586 (1980).

Nonetheless, it is not the case that some facts do not exist to support the General Assembly's decision to place psilocyn along with the

other major hallucinogens in Schedule I. Commentators and researchers have disagreed as to the wisdom of the approach taken in prohibiting these substances (compare Pollock, *The Psilocybin Mushroom Pandemic*, 7 J. Psychedelic Drugs 73 (1975), and Note, *Hallucinogens*, 68 Colum. L. Rev. 521, 554-60 (1968), with Young, Hutchinson, Milroy and Kesson, *The Rising Price of Mushrooms*, The Lancet 213 (Jan. 23, 1982)). But, "[w]hether the enactment is wise or unwise; whether it is based on sound economic theory; whether it is the best means to achieve the desired results, and whether the legislative discretion within its proscribed limits should be exercised in a particular manner are matters for the judgment of the legislature, and the honest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." (*Thillens, Inc. v. Morey* (1957), 11 Ill. 2d 579, 593, 144 N.E.2d 735, 743, *appeal dismissed* (1958), 355 U.S. 606, 2 L. Ed. 2d 524, 78 S. Ct. 538.) At the time that the General Assembly adopted the Uniform Controlled Substances Act, it had before it information concerning the substances proposed to be controlled, including psilocyn (see Illinois Legislative Investigating Commission, *The Drug Crisis—Report of Drug Abuse in Illinois* 114-15, 185-86, 354-63 (1971)), and, based on our discussion concerning the effects produced by psilocyn, we cannot say that their decision to include that substance in Schedule I is so arbitrary as to deny the defendants equal protection of the laws.

For these reasons, we hold that the Controlled Substances Act properly prohibits the knowing possession of mushrooms containing psilocyn as a Schedule I substance and is not unconstitutional for so doing. The trial court thus erred in dismissing the informations against the defendants, and the decision of the circuit court of Williamson County is reversed and the cause is remanded for further proceedings on those informations.

Reversed and remanded.

KARNS, P.J., and JONES, J., concur.