*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

　　　　　　　　　　　　　　　　No. 02-2268

DAAHIR CASEER,

　　　　　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-80955—Denise Page Hood, District Judge.

Argued: June 8, 2004

Decided and Filed: February 28, 2005

Before: BOGGS, Chief Judge; MOORE, Circuit Judge; HOLSCHUH, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Sidney L. Moore, SUTHERLAND, ASBILL & BRENNAN, Atlanta, Georgia, for Appellant. Stephan E. Oestreicher, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Sidney L. Moore, SUTHERLAND, ASBILL & BRENNAN, Atlanta, Georgia, for Appellant. Stephan E. Oestreicher, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Ross G. Parker, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

　　　　MOORE, J., delivered the opinion of the court. BOGGS, C. J. (pp. 15-16), delivered a separate opinion concurring in Parts I. and II.A., and dissenting in part. HOLSCHUH, D. J. (pp. 17-28), delivered a separate opinion concurring in Parts I. and II.B., and dissenting in part.

_____

**OPINION**

_____

　　　　KAREN NELSON MOORE, Circuit Judge. Following a bench trial, Defendant-Appellant Daahir Caseer was convicted on May 15, 2002 of one count of conspiring to import cathinone and one count of aiding and abetting the importation of cathinone. The district court sentenced Caseer to two years' probation. Caseer appeals his conviction, asserting that: (1) the controlled substances

---

[*]The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

schedules in 21 U.S.C. § 812 and 21 C.F.R. § 1308.11(f) did not fairly warn him that possession of khat, a plant containing cathinone, was illegal; and (2) the district court committed clear error in finding that Caseer had the scienter required for conviction. We agree with the district court that Caseer's conviction did not violate due process because the scienter requirement overcomes the threat to due process posed by the failure of the controlled substances schedules to identify khat as a source of cathinone. However, we **REVERSE** Caseer's conviction and **REMAND** the case for further proceedings because, even viewing the evidence in the light most favorable to the prosecution, the evidence is insufficient to support a finding that, beyond a reasonable doubt, Caseer knew that khat was a controlled substance.

# I. BACKGROUND

For centuries, persons in East African and Arabian Peninsular countries such as Somalia, Kenya, and Yemen have chewed or made tea from the stems of the native khat shrub (*Catha edulis*), which is known to have stimulant properties. Khat is often consumed in social settings, and many men in the East African/Arabian Peninsular region use khat. Joint Appendix ("J.A.") at 164-65 (D. Ct. Op. at 5-6). Khat is legal in many parts of East Africa, the Middle East, and Europe; however, khat is illegal in the United States because it contains cathinone, a Schedule I controlled substance, and cathine, a Schedule IV controlled substance. *See* 21 C.F.R. § 1308.11(f) (listing cathinone as a Schedule I stimulant); 21 C.F.R. § 1308.14(e) (listing cathine as a Schedule IV stimulant). State and federal prosecutions relating to khat seem to be a recent phenomenon, with the first reported cases appearing in the mid-1990s. *See United States v. Sheikh,* 367 F.3d 756 (8th Cir. 2004); *United States v. Hussein*, 351 F.3d 9 (1st Cir. 2003); *Connecticut v. Gurreh*, 758 A.2d 877 (Conn. Ct. App. 2000); *Warsame v. Maryland*, 659 A.2d 1271 (Md. 1995); *Minnesota v. Ali*, 613 N.W.2d 796 (Minn. Ct. App. 2000); *Ohio v. Samatar*, 787 N.E.2d 691 (Ohio Ct. App. 2003); *Virginia v. Siad*, No. CRIM 9463, 1997 WL 33421320 (Va. Cir. Ct. Mar. 6, 1997).

At the time of his trial in 2001, Daahir Caseer had lived in the United States for approximately three years, having spent the first sixteen years of his life in Somalia and seven years in Kenya. The events in question began in the spring of 2000, when Caseer approached John Eldridge, a bookkeeper at the Nashville, Tennessee taxicab company where Caseer worked, about the possibility of Eldridge traveling to Amsterdam, the Netherlands, to transport about fifty pieces of khat to the United States. Caseer explained to Eldridge that he could not make the trip himself because of visa issues.[1] Caseer assured Eldridge that khat was an agricultural product and, at worst, customs might confiscate the khat and assess a fine.[2] At trial, Eldridge testified that taxicab drivers in Nashville (80% to 90% of whom he believed to be of Somali or East African descent) frequently chewed khat and that, from his observations, khat was no stronger than caffeine. J.A. at 161 (D. Ct. Op. at 2).

Eldridge agreed to go to Amsterdam along with his girlfriend, Shannon Adams. Eldridge would receive $200.00 to compensate him for a day of missed work, and Eldridge and Adams's travel expenses would be covered by Caseer and several other taxicab drivers who would be dividing the khat. Caseer also admitted during trial that three weeks before Eldridge's trip, $1,500.00 had been sent to Amsterdam via Western Union. However, Caseer explained that the money wired to

---

[1] At the time of these events, Caseer was awaiting approval of his application for permanent residency status. Caseer admitted at trial that he had traveled to Germany a few weeks prior to these events, but that, unlike the Netherlands, Germany did not require a visa.

[2] Douglas Panning, an agent with the United States Customs Service, testified that the U.S. Customs Service's practice at that time was to levy $500.00 fines for small amounts of khat intended for personal use if federal or local authorities decided not to prosecute.

Amsterdam was unrelated to the khat and was bound for Somalia and that the khat was a gift from a Mr. Awale and three or four other people.

After arriving in Amsterdam on June 3, 2000, Eldridge and Adams met with Awale, who removed the contents of their luggage and left with the empty bags. The morning that Eldridge and Adams were to fly back to the United States, Awale returned with the three bags, now containing approximately 285 bundles of khat, or roughly 14,250 stems.

Eldridge and Adams returned to the United States on June 5, 2000, landing at the airport in Detroit, Michigan. A drug-detection dog at the Detroit airport alerted on one of the bags filled with khat, and a Drug Enforcement Agency ("DEA") agent approached Eldridge and Adams. The pair agreed to cooperate with the investigation, and Eldridge placed a recorded telephone call to Caseer informing him that he had arrived and had cleared customs. At trial, Eldridge testified that during the telephone call, he complained about the amount of khat being greater than Caseer had indicated and reiterated his understanding that Caseer would pay his travel and related expenses. Caseer told Eldridge to trust him and that Eldridge did not need to discuss the matter with anyone else. Eldridge also testified that he met with Caseer after returning to Nashville and that Caseer told him they had not done anything illegal and would not be prosecuted, that he would take care of it, and that Eldridge should just stay quiet and not say anything about Caseer's involvement.

Agent Panning then traveled to Nashville and arrested Caseer. During questioning, Caseer admitted knowing Eldridge, Adams, and Awale. Caseer initially stated that Eldridge had purchased the airplane tickets; however, Caseer later said that a Hussein Abugar had made the purchase. At trial, Caseer stated that he may have lied to Agent Panning, but that he only did so because he was shaky and scared.

A sample of the khat seized by the DEA was sent to the Michigan State Police for analysis. Jurgen Switalski, a chemist employed by the Michigan State Police, tested the khat and concluded that it contained cathinone and cathine, but did not determine in what amounts. Switalski testified that, once khat has been harvested, the cathinone begins to dissipate and the cathine level rises; however, Switalski stated that he did not know how long it would take for the cathinone to degrade.

Eldridge, Adams, and Caseer were indicted on two counts: (1) conspiracy to import cathinone; and (2) importation of cathinone, and aiding and abetting the importation of cathinone.[3] Eldridge agreed to testify against Caseer and pleaded guilty to misdemeanor possession of cathinone pursuant to a plea agreement recommending six months' probation. Caseer waived his right to trial by jury and was tried before a district judge for the Eastern District of Michigan.

At the conclusion of the prosecution's case-in-chief, Caseer filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, claiming: (1) that his constitutional right to due process had been violated because he had not been fairly warned of the criminality of

---

[3]There appear to be several inconsistencies amongst the indictment, the district court opinion, and the district court's judgment as to the specific U.S. Code provisions Caseer is accused of violating.

With respect to the first count, the indictment lists the charge as "Conspiracy to Distribute Cathinone" in violation of 21 U.S.C. § 846, but the text of the indictment refers to conspiracy to import cathinone, in violation of 21 U.S.C. §§ 952, 963. Joint Appendix ("J.A.") at 7 (Indictment). We conclude that the district court correctly treated the charge as conspiracy to import cathinone in violation of 21 U.S.C. §§ 952, 963. J.A. at 160 (D. Ct. Op. n.1); J.A. at 181 (Judgment).

With respect to the second count, the indictment's subheading lists the offense as "21 U.S.C. § 841(a)(1) - Importation of Cathinone; 18 U.S.C. § 2 - Aiding and Abetting." J.A. at 8 (Indictment). However, § 841(a)(1) pertains to the manufacture, distribution, and dispensing of controlled substances, not their importation. Based on the references to importation in the text of the indictment and its citation to 21 U.S.C. § 952, which governs importation, the district court correctly treated the charge as arising under § 952. J.A. at 160 (D. Ct. Op. n.2); J.A. at 181 (Judgment).

his actions; (2) that khat qualified as a food item not subject to regulation by the Controlled Substances Act; and (3) that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that Caseer intended to import cathinone. The district court took Caseer's motion under advisement, later denying the motion and finding Caseer guilty on both counts. The district court sentenced Caseer to two years' probation. Caseer now appeals his conviction, asserting the fair warning and insufficiency-of-the-evidence claims first raised in his motion for judgment of acquittal.

## II.  ANALYSIS

### A.  Fair Warning

Caseer first appeals his conviction on the basis that, because the schedule of controlled substances in 21 C.F.R. § 1308.11(f) lists cathinone as a controlled substance without making explicit reference to "khat," he was not fairly warned that importing khat into the United States was illegal and thus his conviction violates due process. Whether a criminal statute is unconstitutionally vague is a legal question which we review de novo. *United States v. Namey*, 364 F.3d 843, 844 (6th Cir. 2004) (citing *United States v. Hill*, 167 F.3d 1055, 1063 (6th Cir.), *cert. denied*, 528 U.S. 872 (1999)).

#### 1.  Establishment of Cathinone as a Controlled Substance

Section 812 of the Controlled Substances Act, 21 U.S.C. § 812, sets forth five schedules of controlled substances which are revised annually by rules promulgated by the Administrator of the DEA and published in 21 C.F.R. § 1308.01 *et seq.* *See* 21 U.S.C. § 811 (providing in part that "(a) The Attorney General shall apply the provisions of this subchapter to the controlled substances listed in the schedules established by section 812 of this title and to any other drug or other substance added to such schedules under this subchapter," and setting forth procedures for adding substances to and removing substances from the controlled substances schedules); 21 U.S.C. § 812(c) & n.1 ("Schedules I, II, III, IV, and V shall, unless and until amended pursuant to section 811 of this title, consist of the following drugs or other substances . . . . Revised schedules are published in the Code of Federal Regulations, Part 1308 of Title 21, Food and Drugs."). Cathinone was not listed in the original Controlled Substances Act schedules but was added by agency rule as a Schedule I controlled substance in 1993:

> (f) *Stimulants.*  Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system, including its salts, isomers, and salts of isomers:
>
> * * *
>
> (3) Cathinone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1235
>     Some trade or other names:  2-amino-1-phenyl-1-propanone, alpha-aminopropiophenone, 2-aminopropiophenone, and norephedrone

21 C.F.R. § 1308.11(f); *see* Schedules of Controlled Substances:  Placement of Cathinone and 2,5-Dimethoxy-4-ethylamphetamine Into Schedule I, 58 Fed. Reg. 4,316 (Jan. 14, 1993).

Although 21 C.F.R. § 1308.11(f) makes clear that cathinone is a controlled substance, neither the U.S. Code nor the Code of Federal Regulations controlled substances schedules refers to the plant from which cathinone is derived, *Catha edulis,* commonly known as "khat."  In contrast, several other chemicals classified as controlled substances are listed in the schedules along with their botanical sources.  *See, e.g.,* 21 C.F.R. § 1308.11(d)(23) (listing "peyote" as a controlled

hallucinogenic substance and explaining that this listing refers to "all parts of the plant presently classified botanically as *Lophophora williamsii Lemaire*, whether growing or not, the seeds thereof, any extract from any part of such plant, and every compound, manufacture, salts, derivative, mixture, or preparation of such plant, its seeds or extracts"); 21 C.F.R. § 1308.11(d)(28) (stating that the term "tetrahydrocannabinols" means "tetrahydrocannabinols naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant or in the resinous extractives of such plant, and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant"); 21 C.F.R. §1308.12(b)(4) (listing in Schedule II "[c]oca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, wh[i]ch extractions do not contain cocaine or ecgonine.").

However, the Supplementary Information published in the Federal Register along with the text of the rule adding cathinone as a Schedule I substance does explain the connection between khat and cathinone. 58 Fed. Reg. at 4,317 ("Cathinone is the major psychoactive component of the plant Catha edulis (khat). The young leaves of khat are chewed for a stimulant effect. Enactment of this rule results in the placement of any material which contains cathinone into Schedule I. When khat contains cathinone, khat is a Schedule I substance. During either the maturation or the decomposition of the plant material, cathinone is converted to cathine, a Schedule IV substance. In a previously published final rule, the Administrator stated that khat will be subject to the same Schedule IV controls as cathine, (see 53 FR 17459, May 17, 1988).[4] When khat does not contain cathinone, but does contain cathine, khat is a Schedule IV substance."). The U.S. Sentencing Guidelines also provide for marijuana equivalency with respect to khat-related offenses, but do not reference the chemical "cathinone." United States Sentencing Guidelines Manual § 2D1.1 (Commentary) (2003) (listing one gram of khat as equivalent to 0.01 grams of marijuana); Amendments to the Sentencing Guidelines for the United States Courts, 60 Fed. Reg. 25,074, 25,079-80 (May 10, 1995).

### 2. Application of Fair-Warning Doctrine to Khat-Related Offenses

At the heart of the fair-warning doctrine is one of the central tenets of American legal jurisprudence, that "[l]iving under a rule of law entails various suppositions, one of which is that '(all persons) are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)); *see also Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."); *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995), *cert. denied*, 516 U.S. 1158 (1996) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the

---

[4]As with the Federal Register document that includes the text of the final rule listing cathinone as a controlled substance, the portion of the Federal Register publication listing cathine as a controlled substance notes the relationship between khat and cathine only in the Supplementary Information section and not in the text of the rule included in the Code of Federal Regulations. *Compare* Schedules of Controlled Substances; Temporary Placement of Cathine ((+) - norpseudoephedrine), Fencamfamin, Fenproporex and Mefenorex Into Schedule IV, 53 Fed. Reg. 17,459, 17,460 (May 17, 1988) (noting relationship between khat and cathine in Supplementary Information section), *with* 21 C.F.R. § 1308.14(e)(1) (listing cathine as a Schedule IV controlled substance but including no reference to khat).

innocent by not providing fair warning.'") (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

Vague laws are subject to particular scrutiny when criminal sanctions are threatened or constitutional rights are at risk. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S 489, 498-99 (1982) ("The degree of vagueness that the Constitution tolerates — as well as the relative importance of fair notice and fair enforcement — depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action . . . . The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe . . . . [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *Belle Maer Harbor v. Charter Township of Harrison*, 170 F.3d 553, 559 (6th Cir. 1999) ("[A]lthough we do not require impossible clarity in standards governing conduct, the court must apply a relative strict standard of scrutiny here where criminal sanctions apply.") (citing *Kolender v. Lawson*, 461 U.S. 352, 361 (1983); *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994)). As the Supreme Court explained in *United States v. Lanier*, courts safeguard criminal defendants' due process right to a fair warning in several fashions:

> First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

520 U.S. 259, 266-67 (1997) (internal quotation marks and citations omitted).

Although the doctrine of fair warning emphasizes the importance of citizens understanding what conduct is and is not prohibited, courts also frequently invoke the maxim that ignorance of the law is no defense. *See Lambert v. California*, 355 U.S. 225, 228 (1957) (noting that the "[t]he rule that 'ignorance of the law will not excuse' is deep in our law . . . .") (quoting *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 68 (1910)); *see also Nash v. United States*, 229 U.S. 373, 377 (1913) ("[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death."). As we have previously observed, "The requirement of fair notice is not applied mechanically or without regard for the common sense judgment that people do not review copies of every law passed." *Columbia Natural Res.*, 58 F.3d at 1105.

Thus, while "[v]agueness may invalidate a criminal statute if it either (1) fails 'to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits' or (2) authorizes or encourages 'arbitrary and discriminatory enforcement,'" *United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)), the

Supreme Court has also stated that "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement,'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). *See Columbia Natural Res.,* 58 F.3d at 1105 ("As a practical matter, the Supreme Court considers the latter concern the more important. This reflects the common sense understanding that the average citizen does not read, at his leisure, every federal, state, and local statute to which he is subject.").

The case at bar differs from most fair-warning cases in that the criminal provision at issue here is not ambiguous in the traditional sense. Neither party has challenged the fact that 21 C.F.R. § 1308.11(f)(3) on its face explicitly establishes cathinone as a Schedule I controlled substance. Rather, the asserted constitutional defect of this provision is that through the definition of prohibited conduct by the use of an obscure scientific term, i.e., "cathinone," persons of ordinary intelligence, even after reading the statutory text, would be unaware that khat is a controlled substance. In other words, the controlled substances schedule's vagueness derives not from the language's imprecision but rather from the schedule essentially being written in a language foreign to persons of ordinary intelligence. When a statute is precise on its face yet latently vague, the danger of persons being caught unaware of the criminality of their conduct is high. *Cf. Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) ("The thrust of the distinction . . . is to produce a potentially greater deprivation of the right to fair notice in this sort of case, where the claim is that a statute precise on its face has been unforeseeably and retroactively expanded by judicial construction, than in the typical 'void for vagueness' situation. When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction. If the Fourteenth Amendment is violated when a person is required 'to speculate as to the meaning of penal statutes,' as in *Lanzetta*, or to 'guess at (the statute's) meaning and differ as to its application,' as in *Connally*, the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question.").

We have previously noted that the "general rule that citizens are presumed to know the requirements of the law . . . is not absolute, and may be abrogated when a law is 'so technical or obscure that it threatens to ensnare individuals engaged in apparently innocent conduct,' because to presume knowledge of such a law would violate a core due process principle, namely that citizens are entitled to fair warning that their conduct may be criminal." *United States v. Napier*, 233 F.3d 394, 397-98 (6th Cir. 2000).

The use of scientific or technical terminology or terms of art common in a regulated field does not automatically render a statute unconstitutionally vague. *See Vill. of Hoffman Estates*, 455 U.S. at 501 n.18 (citing dictionaries defining "roach" as the butt of a marijuana cigarette and explaining that, "The Court of Appeals criticized the . . . fail[ure] to explain what a 'roach clip' is. This criticism is unfounded because that technical term has sufficiently clear meaning in the drug paraphernalia industry. Without undue burden, Flipside could easily determine the meaning of the term."); *Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 502 (1925) ("[T]he term 'kosher' has a meaning well enough defined to enable one engaged in the trade to correctly apply it, at least as a general thing."); *Omaechevarria v. Idaho*, 246 U.S. 343, 348 (1918) ("It is also urged that the Idaho statute, being a criminal one, is so indefinite in its terms as to violate the guaranty by the Fourteenth Amendment of the due process of law, since it fails to provide for the ascertainment of the boundaries of a 'range' or for determining what length of time is necessary to constitute a prior

occupation a 'usual' one within the meaning of the act.  Men familiar with range conditions and desirous of observing the law will have little difficulty in determining what is prohibited by it.").

However, when we evaluate a provision, like the one at issue here, that regulates the conduct of the public at large and not a particular industry or subgroup, we do not impute specialized knowledge to the "person of ordinary intelligence" by whom we judge the statute's vagueness.  As the Supreme Court explained in *Connally*:

> The precise point of differentiation in some instances is not easy of statement; but . . . generally . . . the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, or . . . that, for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded.

269 U.S. at 391-92 (internal quotation marks and citations omitted); *see Springfield Armory, Inc.,* 29 F.3d at 253 (holding city assault weapons ordinance unconstitutionally vague on its face because "[n]othing in the ordinance provides sufficient information to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage.  The record indicates that the average gun owner knows very little about how his gun operates or its design features.  These vagueness problems are not difficult to remedy.  The subject matter does allow for more exactness.  It is not a case in which greater specificity would interfere with practical administration.  To the contrary, Columbus has many options for effectively pursuing its stated goals without running afoul of due process.") (citations omitted).

Here, the term "cathinone" is sufficiently obscure that persons of ordinary intelligence reading the controlled substances schedules probably would not discern that possession of khat containing cathinone and/or cathine constitutes possession of a controlled substance.  Persons seeking clarification of 21 C.F.R. § 1308.11(f) would be unaided by many mainstream dictionaries, as they contain no definitions for "cathinone" and make no reference to the chemical in their definitions of "khat."  *See* American Heritage Dictionary of the English Language 294, 961 (4th ed. 2000) (including no definition for "cathinone" and defining "khat" as "1.  An evergreen shrub (*Catha edulis*) native to tropical East Africa, having dark green opposite leaves that are chewed fresh for their stimulating effects.  2.  A tealike beverage prepared from the leaves of this plant."); Merriam-Webster's Collegiate Dictionary 195, 685 (11th ed. 2003) (providing no definition for "cathinone" and defining "khat" as "a shrub (*Catha edulis*) of the staff-tree family cultivated in the Middle East and Africa for its leaves and buds that are the source of a habituating stimulant when chewed or used as a tea"); Oxford English Dictionary Online, *at* http://www.oed.com (containing no definition for "cathinone" and defining "kat" as "[a] shrub, *Catha edulis*, family Celastraceæ, a native of Arabia, where it is extensively cultivated for its leaves, which have properties similar to those of tea and coffee; the narcotic drug obtained from the leaves of this plant.").[5]

---

[5]We also note that the failure to include a reference to the khat shrub in the controlled substances schedule is not, as the government contends, akin to omitting street names or slang terms.  In *United States v. Levy*, we rejected a challenge to the use of the term "cocaine base" in lieu of "crack cocaine," stating that, "The fact that a type of contraband may have various nicknames on the street does not render a statute punishing possession of that contraband invalid simply because it fails to list all of the then-current nicknames."  904 F.2d 1026, 1033 n.1 (6th Cir. 1990), *cert. denied,* 498 U.S. 1091 (1991).  Here, in contrast, referring to the botanical source of cathinone as "khat" is not a passing fad that would require repeated amendment of the controlled substances schedules, but rather is the commonly accepted method of referencing the plant *Catha edulis*.

We are hesitant to embrace the notion that statements linking cathinone and khat published in the Federal Register or the 1971 United Nations Convention on Pysychotropic Substances would alone establish fair warning sufficient to sustain a criminal conviction in this case.[6] Publication in the Federal Register of regulations which have the force of law does furnish constructive notice of the content of those regulations to those subject to them. *See Yakus v. United States*, 321 U.S. 414, 435 (1944) (citing 44 U.S.C. § 307, now codified as 44 U.S.C. § 1507). However, "Supplementary Information" accompanying an agency rule is separate from the text of the rule itself and is not codified in the Code of Federal Regulations. Hence, publication of the "Supplementary Information" in the Federal Register does not furnish notice sufficient to cure a vague criminal statute of its constitutional defect. *See* John Calvin Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 Va. L. Rev. 189, 231 (Mar. 1985) (asserting that "[t]he real source of notice is not the arcane pronouncements of the law reports but the customs of society and the sensibilities of people — what Holmes termed a sense of 'common social duty.' . . . [I]t may well be that preoccupation with the concept of 'lawyer's notice' has diverted our attention from instances of real unfairness.") (quoting *Nash,* 229 U.S. at 377).

Despite these concerns, we are mindful of the fact that "[t]he classification of a federal statute as void for vagueness is a significant matter. The Supreme Court has held that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Columbia Natural Res.*, 58 F.3d at 1105 (internal quotation marks and citations omitted); *see Screws v. United States*, 325 U.S. 91, 98 (1945) ("This Court has consistently favored that interpretation of legislation which supports its constitutionality.").

Crimes arising out of the importation of controlled substances require proof that the defendant "knowingly or intentionally import[ed] . . . a controlled substance . . . ." 21 U.S.C. § 960(a)(1). Thus, the concern that a person of ordinary intelligence could unwittingly expose himself or herself to criminal penalties due to the vagueness of the controlled substances schedules with respect to khat is overcome here because, as discussed in Part II(B) below, conviction requires a showing of actual knowledge that khat contains a controlled substance. *See Vill. of Hoffman Estates*, 455 U.S at 499 ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 342 (1952) ("The statute punishes only those who knowingly violate the Regulation. This requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid."); *Screws,* 325 U.S. at 102-03 ("[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law . . . . [A] requirement of a specific intent . . . saves the Act from any charge of unconstitutionality on the grounds of vagueness."). Although the requirement of specific intent in this case mitigates any constitutional infirmity resulting from the vagueness of the controlled substances schedules, we caution against the drafting of criminal statutes, targeted at the general populace, that rely on obscure technical or scientific terms foreign to ordinary persons, lest we "sanction[] the practice of Caligula who 'published the law, but it was written in a very small hand, and posted up in a corner, so that no one could make a copy of it.' Suetonius, Lives of the Twelve Caesars, p. 278." *Screws,* 325 U.S. at 96.

---

[6] We also reject the contention that the U.S. Sentencing Guidelines' establishment of marijuana equivalency for khat-related offenses furnished Caseer sufficient fair warning of the illegality of khat. *See United States v. Smith*, 73 F.3d 1414, 1417 (6th Cir. 1996) (rejecting vagueness challenge to Sentencing Guidelines provision, stating that, "The Sentencing Guidelines do not establish the illegality of any conduct. Rather, they are directives to judges and not citizens.") (internal quotation marks and citation omitted).

## B.  Sufficiency of the Evidence

Caseer also asserts that his conviction cannot stand because the district court erred in denying his motion for judgment of acquittal and convicting him on the basis that he had sufficient notice and knowledge to satisfy the scienter requirement.[7]  Where, as here, the district court has conducted a bench trial, this court reviews the district court's findings of fact for clear error and its conclusions of law de novo.  *See United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir.), *cert. denied*, 536 U.S. 948 (2002); *United States v. Atwell*, 570 F.2d 650, 652 (6th Cir. 1978).  A district court has clearly erred when this court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981) (internal quotation marks and citations omitted).

When a defendant challenges his or her conviction after a bench trial on the basis of insufficiency of the evidence, we must determine "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir. 1992) (internal quotation marks and citation omitted); *see also Al-Zubaidy*, 283 F.3d at 808.  All conflicts in testimony are resolved in the government's favor, and every reasonable inference is drawn in favor of the government. *Bashaw*, 982 F.2d at 171.  As the Fifth Circuit has accurately observed, "If the evidence, however, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances 'a reasonable jury *must necessarily entertain* a reasonable doubt." *United States v. Reveles*, 190 F.3d 678, 686 (5th Cir. 1999) (internal quotation marks and citations omitted).

In its analysis of the scienter requirement for the first count, conspiracy to import cathinone, the district court stated in summary fashion that:

> Defendant Caseer testified that he requested Eldridge to bring back khat from Amsterdam.  Defendant Caseer knowingly and voluntarily joined in the conspiracy . . .

> The Government has proven beyond a reasonable doubt that Defendant Caseer knowingly, intentionally and unlawfully conspired and agreed with Eldridge to import cathinone into the United States from Amsterdam, in violation of 21 U.S.C. § 846.

J.A. at 178 (D. Ct. Op. at 19).  Likewise, in finding the intent element of the crime of aiding and abetting the importation of cathinone satisfied, the district court simply stated that, "Defendant Caseer knowingly arranged for the khat to be brought into the United States.  Defendant Caseer had sufficient notice based on the above discussion that khat contains cathinone and/or cathine which are both scheduled substances."  J.A. at 179 (D. Ct. Op. at 20).

In ruling on Caseer's fair-warning challenge to the controlled substances schedules, the district court also considered the extent of Caseer's notice and knowledge.  The district court first reviewed the May 1988 and January 1993 publications in the Federal Register relating to the listing of cathinone and cathine as controlled substances, and a notice of amendment to the U.S. Sentencing Guidelines providing for the treatment of khat as a marijuana equivalent.  J.A. at 172-74 (D. Ct. Op. at 13-15).  The district court next considered our decision in *United States v. Hofstatter*, 8 F.3d 316, 320 (6th Cir. 1993), *cert. denied*, 510 U.S. 1131 (1994), which noted in passing that khat contained

---

[7]Because we conclude that the evidence presented at trial is insufficient to sustain Caseer's conviction, we need not address whether, based on the evidence presented in the government's case-in-chief, the district court erred in denying Caseer's Rule 29 motion for judgment of acquittal.

cathinone, as well as state court cases from Maryland, Minnesota, and Connecticut treating khat as a controlled substance under state law. J.A. at 174-76 (D. Ct. Op. at 15-17). The district court then concluded as follows:

> Because the terms "cathinone" and "khat" have been published in the Federal Register on more than one occasion, Defendant's argument is without merit. The May 1988 Federal Regulations noted that "khat" is subject to Schedule IV, the same as "cathine." The 1993 Federal Register notice indicating the addition of cathinone as a scheduled drug made reference to "khat" — that cathinone is found in khat. The 1993 Federal Register indicated that as far back as 1971, the international community has recognized the effect of "cathinone" and "khat" as evidenced by the 1971 United Nations Convention on Psychotropic Substances. Subsequent publications in the Federal Register have since referred to "khat" including the Sentencing Guidelines in 1995. "Khat" has been an unapproved for importation by the FDA since the early 1980's and the FDA issued publications in the Federal Register regarding "khat" in 1995 and 1996. Additionally, the State cases addressing the notice issue of a State prosecution for "khat" and "cathinone" have found that the defendants had adequate notice and fair warning regarding the possession of khat. All these references to "khat" in the Federal Register, the United Nations Convention, the State cases cited above and the Sixth Circuit noting that "khat" contains "cathinone," serve sufficient notice that "khat," if it contains cathinone, is a Scheduled I drug and a Scheduled IV drug if it contains cathine. Defendant Caseer was aware of the stimulant effect of khat. He testified that khat is a stimulant and gives energy like tea and coffee. Even though he testified that he did not know that khat or cathinone was illegal, he was aware that khat could be seized or confiscated at Customs. Defendant Caseer had sufficient notice and had knowledge that khat, if it contains cathinone and/or cathine, is a scheduled drug. Defendant Caseer also had sufficient notice and knowledge that khat is a stimulant and that the importation of khat is prohibited and illegal. Defendant Caseer's Motion for Judgment of Acquittal must be denied.

J.A. at 176-77 (D. Ct. Op. at 17-18).

As we concluded above in our analysis of Caseer's fair-warning claim, the criminal provisions at issue here are saved from potential unconstitutionality because 21 U.S.C. § 960 establishes as an element of the offenses that the accused knowingly or intentionally imported a controlled substance. Thus, to convict Caseer properly of the charged offenses, the district court would need to have found beyond a reasonable doubt that Caseer actually knew that khat contained a controlled substance.[8] *See Hussein*, 351 F.3d at 17 (upholding jury instruction that, in order to find that the defendant knowingly possessed cathinone, "'the government must prove beyond a reasonable doubt that [the defendant] *[1] knew that the substance he possessed contained cathinone, or [2] knew that the substance he possessed contained a controlled substance.* A controlled substance is a drug or other substance regulated under federal drug abuse law.") (second and third alterations and emphasis added in *Hussein*); *United States v. Restrepo-Granda*, 575 F.2d 524, 527 (5th Cir.), *cert. denied*, 439 U.S. 935 (1978) ("Although knowledge that the substance imported is

---

[8]This is not to suggest that in all Controlled Substances Act prosecutions the government must prove beyond a reasonable doubt that the defendant had actual knowledge that the substance at issue is controlled. For substances such as cocaine that are controlled per se under the controlled substances schedules and for which there are no due process fair-warning concerns, constructive knowledge inferred from the listing of the substance in the controlled substances schedules may suffice. However, when a targeted item, such as khat, is not itself listed in the controlled substances schedules, due process requires that the government prove beyond a reasonable doubt that the defendant had actual knowledge that the targeted item contained a controlled substance regulated under federal drug abuse laws. *See United States v. Hussein*, 351 F.3d 9, 17-19 (1st Cir. 2003).

a particular narcotic need not be proven, 21 U.S.C. 952(a) is a 'specific intent' statute and requires knowledge that such substance is a controlled substance.") (citations omitted); *see also United States v. Jones*, No. 02-1351, 2003 WL 22701306, ** 3 (6th Cir. Nov. 12, 2003), *cert. denied*, 124 S. Ct. 1699 (2004) ("Pursuant to 21 U.S.C. § 841(a)(1), it is unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. To convict a defendant under § 841(a)(1), the Government must prove beyond a reasonable doubt that: (1) the defendant possessed the controlled substance described in the indictment; (2) the defendant knew the substance was a controlled substance; and (3) the defendant intended to distribute the controlled substance.") (internal quotation marks and citations omitted); *United States v. Decker*, 19 F.3d 287, 288, 290 (6th Cir. 1994). Keeping in mind that the government must prove beyond a reasonable doubt that Caseer knew khat contained a controlled substance, we now turn to the facts identified by the district court as supporting its finding of scienter, considering whether the district court clearly erred in making any individual fact findings and whether the evidence taken as a whole is sufficient that a reasonable trial judge could conclude beyond a reasonable doubt that Caseer had the requisite intent for conviction.

First, the district court points to the 1971 United Nations Convention on Psychotropic Substances and several Federal Register publications that explain that khat contains cathine and cathinone, that establish marijuana equivalency for sentencing of khat-related crimes, and that indicate that khat may be subject to FDA regulation. Although Caseer might be charged with constructive knowledge of the contents of these documents, the mere existence of these documents does not speak to whether Caseer had actual knowledge of their contents. The district court made no finding, and the record furnishes no evidence, that Caseer read or was otherwise familiar with any of these publications. Thus, the existence of the United Nations and Federal Register publications provides no support for a finding of scienter in this case.

Second, the district court cites this court's decision in *Hofstatter* and several state prosecutions for khat-related offenses as evidence that Caseer knew khat was a controlled substance. In *Hofstatter*, we affirmed the convictions of two defendants charged with possessing and conspiring to possess listed precursor chemicals with the intent to manufacture controlled substance analogues. We noted in passing that during a search of one of the defendants' automobiles, DEA agents:

> found two bags containing personal papers, notebooks, and envelopes in the name of [the codefendant]. The documents described "khat" (an East African plant containing cathinone) and methylaminorex . . . . Formulae for the manufacture of methylcathinone were found in the car, as was a Federal Register notice indicating that methylaminorex was to be scheduled as a controlled substance by the DEA.

8 F.3d at 320. In the absence of proof that Caseer read or was otherwise aware of our decision in *Hofstatter*, concluding that this single reference in *Hofstatter* to khat furnished the actual notice to Caseer required for conviction in the present case would be clear error. Moreover, the state cases referenced by the district court, *Connecticut v. Gurreh*, 758 A.2d 877 (Conn. Ct. App. 2000); *Warsame v. Maryland*, 659 A.2d 1271 (Md. 1995); and *Minnesota v. Ali*, 613 N.W.2d 796 (Minn. Ct. App. 2000), all pertain to state, not federal, controlled substances statutes, and there is no evidence to suggest that Caseer had ever been subject to the laws of these three states. Hence, it cannot be inferred from the existence of these four cases that Caseer knew that khat contains controlled substances regulated by the federal government.

Third, the district court found that Caseer was "aware of the stimulant effect of khat" based on Caseer's trial testimony[9] that "khat is a stimulant and gives energy like tea or coffee." J.A. at 177 (D. Ct. Op. at 18). Although actual knowledge that a substance is controlled might in some cases be inferred from the physical effects caused by the substance, in this case the stimulant effect of khat is too mild to permit a reasonable inference that Caseer knew that khat contained a controlled substance. The district court's opinion indicates that Caseer knew only that khat had a mild stimulant effect and indeed seems to suggest that chewing khat is the Somali equivalent of drinking coffee or tea in the United States. The seeming ubiquity of coffee houses in the United States attests to the fact that consuming products with stimulating effects is common custom in the United States, and the average American coffee drinker most likely does not pause to consider while drinking his or her morning "cup of Joe" whether he or she may be subject to criminal sanction for possession of a controlled substance. *See Lambert v. California*, 355 U.S. 225, 229-30 (1957) (reversing conviction for failure to comply with felon-registration ordinance, explaining that, "As Holmes wrote in The Common Law, 'A law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear.' Its severity lies in the absence of an opportunity either to avoid the consequences of the law or to defend any prosecution brought under it. Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process. Were it otherwise, the evil would be as great as it is when the law is written in print too fine to read or in a language foreign to the community."). Thus, Caseer's awareness of the mild stimulant effect of khat provides little support for the conclusion that Caseer actually knew that the khat he was importing was a controlled substance.

Finally, the district court found that, although Caseer "testified that he did not know that khat or cathinone was illegal, he was aware that khat could be seized or confiscated at Customs." J.A. at 177 (D. Ct. Op. at 18). Not all items that may be seized by the U.S. Customs Service, however, are classified as controlled substances pursuant to 21 U.S.C. § 812 and 21 C.F.R. § 1308.11. Thus, while the district court could reasonably infer from Caseer's testimony that Caseer knew importation of khat violated U.S. customs laws, it is less reasonable to infer that Caseer knew he would be violating U.S. drug laws by importing a controlled substance.[10]

In sum, the evidence cited by the district court in its determination of whether Caseer had the requisite scienter for conviction lends, at best, only tenuous support for the conclusion that Caseer knew that he was participating in the importation of a controlled substance. Even drawing

---

[9] We note that the district court erred to the extent it relied on Caseer's testimony in ruling on his motion for judgment of acquittal. Because the district court reserved ruling on the motion at the close of the government's case-in-chief, the district court should have considered only the evidence put on by the government and not any evidence presented by Caseer in his own defense. *See* Fed. R. Crim. P. 29(b) (providing that when a court has reserved ruling on a motion for judgment of acquittal, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved").

[10] The government also contends that it is reasonable to infer from Caseer's behavior in arranging for the importation of khat and his subsequent conduct during the government's investigation that Caseer knew khat was a controlled substance. The district court did not make any findings regarding Caseer's state of mind based on such behavior, and arguably such conduct is consistent with that of a recent immigrant concerned with violating U.S. customs laws. Any inference from this evidence that Caseer knew he would be importing a controlled substance, and not simply an agricultural product regulated by customs laws, would be weak at best and insufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that Caseer had actual knowledge that the khat he imported was a controlled substance. *See Hussein*, 351 F.3d at 20-21 (finding "very close" the question of whether sufficient evidence of scienter had been presented to sustain conviction, notwithstanding that the defendant: (1) "was a knowledgeable individual; he was not a recent immigrant, but a successful businessman who had been in the United States for a number of years;" (2) knew that khat was a stimulant; (3) had made prior trips to pick up khat for a local distributor; and (4) knew that the methods for sending and receiving packages, including mislabeling, use of fake addresses, and recruitment of multiple couriers, were "elaborately contrived to avoid detection").

all inferences in the light most favorable to the government, a rational trier of fact would have reasonable doubt that Caseer knew that khat was a controlled substance. Thus, Caseer's conviction cannot stand.

### III. CONCLUSION

For the reasons set forth above, we conclude that, although the criminal provisions at issue are not unconstitutional for failure to furnish fair warning, we must **REVERSE** the judgment of conviction because of the insufficiency of the evidence and **REMAND** the case to the district court for further proceedings consistent with this decision.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

BOGGS, Chief Judge, concurring in part and dissenting in part. I concur in Judge Moore's well-reasoned opinion with respect to the interpretation and constitutionality of the language of the federal drug laws, as they apply to the substance khat (Part II. A). Since the application of the drug laws to Mr. Caseer is constitutional so long as the statutory requirement of *scienter* is met, the question of *scienter* is crucial. I dissent, however, from the court's conclusion that there was insufficient evidence of *scienter*.

The district court correctly identified and applied, in denying the motion for acquittal at the end of the government's case, the standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) that the motion should not be granted unless *no* "rational finder of fact could find" the defendant guilty beyond a reasonable doubt on the evidence presented.

In this case, at the time of the denial of the motion, the government had presented evidence that:

1. Caseer had been in this country for three years, and had been immersed in an employment and ethnic culture in which consumption of khat was widespread.

2. Even though Caseer himself had recently gone to Europe, he recruited and paid apparently unwitting persons to go to Europe and courier a large quantity of khat back to him.

3. Immediately before the trip, he had wired $1,500 to an acquaintance in Amsterdam, who was the person who supplied the khat to the couriers. Although Caseer later provided an explanation for the sending of this money, that explanation was uncorroborated and the court was under no obligation to accept it.

4. Caseer coached the couriers in silence with respect to law enforcement officers, and took steps to prevent his name from being connected with the khat, both before and after the couriers were apprehended. Even when Caseer thought the couriers had successfully cleared customs and delivered the khat, he continued to counsel them to silence.

As seen in a variety of other cases, e.g., *United States v. Hussein*, 351 F.3d 9 (1st Cir. 2003), *United States v. Lewis*, 676 F.2d 508 (11th Cir. 1982), and *United States v. Barnes*, No. 90-5165, 1991 WL 1336 (6th Cir. Jan 10, 1991) (unpublished), evidence of evasion and consciousness of guilt can support a finding of *scienter*. In this case, such evidence is present in abundance. Caseer's best argument to the contrary is that his questionable actions were all because he feared simple confiscation of his cargo under the agricultural laws, not because he had any idea that he was trafficking in controlled substances, of whatever variety. Indeed, his brief argues that "many things people bring in from other countries, such as apples or bottles of liquor, can be confiscated at customs without being controlled substances." (Appellant's Br., p. 65).

However, his attempts at insulating himself from connection with the khat went far beyond what would be consistent with bringing in illicit apples, or at least the district judge, as finder of fact, was entitled to make such a judgment. And in denying the Rule 29 motion, the judge, as determiner of law, was entitled, contrary to this panel, to determine that she was rational in so doing.

While Caseer's explanation is ingenious, the judge was not obliged to believe it, any more than the judge in *Barnes* was required to believe that the person who arranged for a "swallower" to

import a substance in ingested condoms actually thought he was dealing in gold rather than in heroin. See 1991 WL 1336 at *1.

In addition, at the time of the Rule 29 motion, there was evidence that the "street value" of the khat imported was upward of $100,000. This would be strong additional support for the *scienter* that there was something considerably more sinister involved than illegal fruit importation. The judge could take that testimony at face value at the time of the initial submission of the Rule 29 motion.

The value figure was contradicted, though not demolished, in Caseer's own testimony, but when judging the final verdict of guilt we may, as did the district judge, take into account Caseer's own testimony, and the unbelievability of some parts of it, such as his explanations of why he recently went to Germany, but just didn't have time to pick up khat, and couldn't go to Amsterdam himself, but had to use a courier, as well as his explanation that the money wired to the khat supplier, just before the importation, had nothing to do with the almost contemporaneous supplying of the khat.

Under these circumstances *some* rational finder of fact could determine that Caseer's clandestine efforts to avoid detection and thwart law enforcement, coupled with his knowledge of the khat culture, constitutes adequate circumstantial evidence that he knew that he was importing a controlled substance. I do not believe Judge Hood erred in being such a rational fact finder.

In a relatively comparable case, albeit involving a person who was only a courier, the First Circuit found, in *Hussein*, that the finder of fact could find sufficient evidence of *scienter* based on

> four key facts. First, the appellant was a knowledgeable individual; he was not a recent immigrant, but a successful businessman who had been in the United States for a number of years. Second, he knew that what he possessed was khat and that khat was used as a stimulant. Third, this was not his first trip for Mohamed. Last-but far from least-he knew that the arrangements for shipping and retrieving the packages were elaborately contrived to avoid detection.

*Hussein*, 351 F.3d at 20. Although the First Circuit found the case to be a close one, as I find this case, I would come to the same conclusion. In our case, there are several factors that are even stronger than in *Hussein*, primarily that Caseer was not a mere courier, but was the organizer, recipient, and paymaster for the operation and that Caseer here testified, permitting the finder of fact to assess the credibility of his explanations. Although in the *Hussein* case the court also noted the repeat nature of Hussein's involvement, that factor, when weighed against the other similarities (including knowledge of the nature of khat as a stimulant and elaborate measures to evade detection) lead me to the same conclusion.

On balance, the case against Caseer is at least as strong, and the *Hussein* case would therefore counsel toward an affirmance of the district court judgment. I would so hold, and I therefore respectfully dissent.

---

## CONCURRING IN PART, DISSENTING IN PART

---

HOLSCHUH, District Judge, concurring in part and dissenting in part. Judge Moore's opinion is not only a thorough and well-written recitation of the facts and a careful analysis of the law, it also is very balanced in its consideration of the two major issues in this appeal, the constitutionality of the regulations that make the possession of cathinone and cathine criminal offenses and the sufficiency of the evidence in this case to support appellant's conviction for the importation of cathinone. I totally agree with Judge Moore that there was insufficient evidence to show that the appellant knew that the khat plant contained a controlled substance. I also agree with Judge Moore's analysis regarding the Constitution's due process requirement that a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)), *cert. denied*, 516 U.S. 1158 (1996). My dissent is based on my firm belief that the due process requirement of fair warning has not been met, and that this constitutional failure is not overcome by the fact that conviction of a defendant violating the regulation at issue requires a showing of actual knowledge that the khat plant contains a controlled substance.[1]

Whether a law does or does not give fair warning to a person of ordinary intelligence requires, in my opinion, a consideration of not just the text of the law, but also the nature of the subject of the law and the persons who are subjected to it.

### I.    *The Text of the Regulation*

I agree with the majority that this case differs from most fair-warning cases in that the regulation's listing of cathinone as a controlled substance is not ambiguous in the traditional sense as applied in those cases. As the majority correctly notes, the regulation on its face explicitly establishes cathinone as a Schedule I controlled substance. The majority nevertheless finds a "latent vagueness" in the regulation. The majority states that, "[w]hen a statute is precise on its face yet latently vague, the danger of persons being caught unaware of the criminality of their conduct is high." This latent vagueness "derives not from the language's imprecision but rather from the schedule essentially being written in a language foreign to persons of ordinary intelligence."

My view of the infirmity of the regulation goes further. I don't believe that there is anything vague, patent or latent, regarding the listing of cathinone as a controlled substance. In my view, however, when consideration is given to the subject of the regulation, cathinone, in the context of the regulations in which it is found, and the persons subjected to the regulation, a person of ordinary intelligence would conclude that possession of the khat plant is clearly *not* a violation of any law.

---

[1] Judge Boggs in his separate opinion concurs in Judge Moore's conclusion that the regulations in question are constitutional. In my dissenting opinion I therefore will refer to the majority view as being the view expressed in Part IIA of Judge Moore's opinion.

## II.     *The Subject of the Regulation*

Cathinone is a psychoactive substance that is produced naturally in the khat plant.  The khat plant is unique in that it produces naturally two different chemical components relevant to this case. When it is cut, the khat plant contains a substance identified as cathinone, which begins to degrade after the plant is cut. What remains in the plant is a substance identified as cathine, which has a

lesser stimulant effect than cathinone.[2]  The Controlled Substances Act ("CSA"), 21 U.S.C. § 801, *et seq*., does not list cathinone or cathine as a controlled substance, but subsequent regulations place these two substances, emanating from the same plant, in different controlled substances schedules.

   21 C.F.R. § 1308.11(f)(3)[3] lists cathinone as a Schedule I stimulant as follows:

>   Cathinone

>   Some trade or other names:  2-amino-1-phenyl-1-propanone, alpha-aminopropiophenone, 2-aminopropiophenone, and norephedrone.

   21 C.F.R. § 1308.14(e)(1) lists cathine as a Schedule IV stimulant as follows:

>   Cathine ((+)-norpseudoephedrine).[4]

   The regulations that place cathinone and cathine in different schedules do not mention the khat plant and do not give growers or users of the khat plant even a hint that the khat plant contains *any* controlled substance, much less two different types of controlled substances.  Anyone looking at the regulations, however, would readily see that *some plants* that contain controlled substances *are themselves* listed in the schedules by their commonly known names.

   Marihuana,[5] the common name for a plant of the genus Cannabis, is specifically listed in the statute as a Schedule I controlled substance, 21 U.S.C. § 812(c), Schedule I(c)(10), and in the regulations, 21 C.F.R. § 1308.11(d)(22).  It is described in great detail as follows:

>   The term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16).

   In addition to listing the plant itself, both the statute, 21 U.S.C. § 812(c), Schedule I(c)(17), and the regulations, 21 C.F.R. § 1308.11(d)(30), specifically list Tetrahydrocannabinols ("THC"), which is the main psychoactive substance produced naturally by the marihuana plant.  THC is described in great detail in the regulations as follows:

---

[2]Testimony in the present case is that upon drying or within three days after harvesting of the khat plant, cathinone rapidly decomposes into cathine.  JA 94-95.  The khat plant sample tested in the present case contained both cathinone and cathine.  JA 86.

[3]For reference purposes, citations to the most recent version of the CFR are used.

[4]The (+) represents a positive optical isomer.

[5]Although the more common spelling is "marijuana," the spelling found in the CSA and the regulations is used in this opinion.

Tetrahydrocannabinols
> Meaning tetrahydrocannabinols naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant, or in the resinous extractives of such plant, and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant, such as the following:
> 1 cis or trans tetrahydrocannabinol, and their optical isomers
> 6 cis or trans tetrahydrocannabinol, and their optical isomers
> 3, 4 cis or trans tetrahydrocannabinol, and its optical isomers
> (Since nomenclature of these substances is not internationally standardized, compounds of these structures, regardless of numerical designation of atomic positions covered.)

21 C.F.R. § 1308.11(d)(30).

Peyote, a small spineless cactus, is specifically listed in the statute, 21 U.S.C. § 812(c), Schedule I(c)(12), and in the regulations. It is described in detail in the regulations as follows:

> Meaning all parts of the plant presently classified botanically as *Lophophora williamsii Lemaire*, whether growing or not, the seeds thereof, any extract from any part of such plant, and every compound, manufacture, salts, derivative, mixture, or preparation of such plant, its seeds or extracts
> (Interprets 21 U.S.C. 812(c), Schedule 1(c)(12)).

21 C.F.R. § 1308.11(d)(25).

In addition to listing the plant itself, the regulations, 21 C.F.R. § 1308.11(d)(23), specifically list mescaline, the main psychoactive substance produced naturally by the peyote cactus plant, as a controlled substance.[6]

The poppy plant is specifically listed in the statute as a Schedule II controlled substance, 21 U.S.C. § 812(c), Schedule II(a)(3), and in the regulations, 21 C.F.R. § 1308.12(b)(3), as opium poppy and poppy straw. These terms are described in 21 U.S.C. §§ 802(19) and (20) as follows:

> The term "opium poppy" means the plant of the species Papaver somniferum L., except the seed thereof.
> The term "poppy straw" means all parts, except the seeds, of the opium poppy, after mowing.

---

[6]Mescaline (3, 4, 5 - trimethoxyphenethylamine) can be extracted from the peyote plant or produced synthetically. *DEA Briefs & Background, Drugs & Drug Abuse Descriptions, Peyote & Mescaline.* http://www.usdoj.gov/dea/concern/peyote.html (accessed January 28, 2005).

In addition to listing the plant itself, the regulations list specific psychoactive substances produced naturally by the opium poppy plant, *e.g.*, morphine, 21 C.F.R. § 1308.12(b)(1)(14), and codeine, 21 C.F.R. § 1308.12(b)(1)(7), as well as opium derivatives, *e.g.*, heroin, 21 C.F.R. § 1308.11(c)(11),[7] and opiates, 21 C.F.R. § 1308.11(b) and § 1308.12(c).[8]

The leaves of the coca plant are specifically listed in the statute, 21 U.S.C. § 812(c), Schedule II(a)(4), and the regulations, 21 C.F.R. § 1308.12(b)(4).

In addition to listing the leaves of the coca plant themselves, both the statute, 21 U.S.C. § 812 (c), Schedule II(a)(4), and the regulations, 21 C.F.R. § 1308.12(b)(4), specifically list cocaine and ecgonine (products of the cocaine alkaloid, a psychoactive substance produced naturally by the coca plant) as controlled substances.

The regulations, therefore, list a number of specific plants as being themselves controlled substances, giving clear warning that possession of these plants is illegal, regardless of whether the person is aware that the plant contains a particular chemical substance that has a psychoactive effect. Remarkably – and in my opinion, fatally – absent from the regulations is the khat plant. Any person who wants to know whether it is illegal to make a cup of tea from the khat plant would find that, in contrast to other plants such as the marihuana plant, the peyote cactus plant, the poppy plant, and the coca plant, there is no reference of any kind to the khat plant any place in the law of the United States, *i.e.*, either in statutes or in regulations. I totally agree with the majority's statement that "the term 'cathinone' is sufficiently obscure that persons of ordinary intelligence reading the controlled substances schedules probably would not discern that possession of khat constitutes possession of a controlled substance."[9] I would go further, however, because it is my opinion that persons of ordinary intelligence reading the controlled substances schedules could reasonably conclude that possession of the khat plant is clearly *not illegal* because, unlike other plants containing naturally-produced psychoactive substances, the khat plant is not listed.

In *United States v. Hussein*, 351 F.3d 9 (1st Cir. 2003), the appellant, who had been found guilty of knowingly possessing and intending to distribute khat, argued that the regulation regarding cathinone did not give fair notice that the possession of the khat plant was a criminal offense. The First Circuit, however, rejected the argument. In doing so, the court reached two conclusions.

First, it held that, although the khat plant itself is not listed as a controlled substance and therefore "is not a controlled substance per se," *Id.* at 17, it nevertheless is a controlled substance because of the precatory language in 21 C.F.R. § 1308.11(f) which includes, above the list of controlled substances, the language "any material, compound, mixture, or preparation which contains any quantity of the following substances." The court noted that "[w]hen khat is first cut, it contains cathinone and is therefore a Schedule I controlled substance. If and when the cathinone

---

[7] Raw or cooked opium gum taken from the pods of the opium poppy contains more than 35 different alkaloids, including morphine and codeine which can be extracted from the opium. Morphine can be converted into heroin. *U.S. Drug Enforcement Administration, Resources For Law Enforcement Officers, Intelligence Reports, Opium Poppy Cultivation and Heroin Processing, Southeast Asia*. http://www.usdoj.gov/dea/pubs/intel/20026/20026.html (accessed January 28, 2005).

[8] "Opiates" are any drugs or other substances "having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining liability." 21 U.S.C. § 802 (18).

[9] The Government's expert witness, a forensic chemist with a PhD in chemistry, had been employed by the Michigan State Police scientific laboratory for 22 years. He had never heard the word "cathinone" until five years before his testimony in May, 2001. Other than forensic chemists, he knew of no one outside his area of expertise who "would have the faintest idea what cathinone would be." JA 77, 104.

mutates into cathine, khat migrates to Schedule IV." *Id.* at 13.[10] The court, however, concluded that the precatory language "any material . . . containing . . . cathinone" makes it "perfectly clear that the charged conduct – possession of a material containing cathinone – is forbidden." *Id.* at 15.

Second, the court concluded that "[d]ue process does not require the statute specifically to prohibit either 'khat' or 'khat containing cathinone' as a precondition to conviction." *Id.* The due process argument, based on the fact that the regulations do list certain plants – the marihuana plant, the peyote cactus plant, the poppy plant and the leaves of the coca plant – but not the khat plant, was not considered by the court to be persuasive. The court found that the pattern of listing plants in addition to their psychoactive ingredients is "at best, irregular." The court based this finding on the fact that Schedule I lists psilocybin and psilocyn as controlled substances "but not their plant hosts (magic mushrooms)." *Id.* at 16.

I respectfully disagree with both conclusions.

First, when read in context with its adjacent words, "compound, mixture, or preparation," and in context with the framework of the regulations, it is not, in my opinion, "perfectly clear" that the word "material" includes plant life.

The word "material" should not be plucked from the language of 21 C.F.R. § 1308.11(f) and considered in a vacuum. It is a fundamental canon of statutory construction, equally applicable to regulations, that words of a statute or regulation "must be read in their context and with a view to their place in the overall statutory scheme." *David v. Michigan Dep't of the Treasury*, 489 U.S. 803, 809 (1988). The precatory language contained in 21 C.F.R. § 1308.11(f) – "any material, compound, mixture, or preparation which contains any quantity of the following substances" – is identical to the precatory language found in 21 C.F.R. § 1308.11(d) which lists the marihuana plant in addition to THC, and the peyote cactus plant in addition to mescaline. The same precatory language is also found in 21 C.F.R. § 1308.12(b), which lists the opium poppy plant in addition to morphine and codeine, and the leaves of the coca plant in addition to cocaine. Furthermore, the term "marihuana" means "all parts of the plant . . . and every compound . . . mixture, or preparation of such plant . . . ." 21 U.S.C. § 802(16). Similarly, the term "peyote" means "all parts of the plant . . . and every compound . . . mixture, or preparation of such plant . . . ." 21 C.F.R. § 1308.11(d)(25).

When consideration is given to the word "material" in context with the regulations, it is subject to another fundamental canon of statutory construction, *i.e.,* that meaning should not be given to a word in a statute, or regulation, that "renders other provisions of the same statute inconsistent, meaningless or superfluous." *United States v. Ninety-three (93) Firearms*, 330 F.3d 414, 420 (6th Cir. 2003). If "material" is read to include all plant life, the listing of the marihuana plant and the peyote cactus plant, and the use of the same words "compound," "mixture," or "preparation" in the description of those plants, clearly would be superfluous.

To support its conclusion, the court in *Hussein* considered a hypothetical case of a defendant possessing a sugar cube containing detectable amounts of LSD, a listed controlled substance. It would be clear, the court found, that the statute gave fair warning that it would be illegal to possess "a material containing LSD." *Hussein*, 35 F.3d at 16. While it is obvious that the sugar cube would clearly be "material" containing a controlled substance, it does not follow that any plant naturally containing a listed controlled substance is a "material" within the scope of the regulations. While

---

[10]In *Argaw v. Ashcroft*, –F.3d–, 2005 WL 196549 at *4 (4th Cir. Jan. 31, 2005), the Fourth Circuit specifically held that "[k]hat, in short, is not a controlled substance because the schedules themselves contain no reference to the plant." Because it was not established that petitioner's khat contained either cathinone or cathine, a Board of Immigration Appeals' order of removal, which was based on a finding that khat was a controlled substance, was reversed.

various kinds of controlled substances, such as LSD,  may be concealed in different types of materials or may be mixed with other substances for consumption purposes or to avoid detection by law enforcement agencies, cathinone and cathine are natural ingredients of the khat plant in the same manner, for example, that THC is a natural ingredient of the marihuana plant.  Plants are listed separately in the regulations as controlled substances and, for that reason, the hypothetical sugar cube containing LSD, in my opinion, has little, if any, relevance to the plant life involved in this case.

Considering the word "material" in the context of its adjacent words, "compound, mixture, or preparation" and in the context of certain plant life being specifically listed following the same precatory language, it is not, in my opinion, "perfectly clear" that "material" includes all plants that produce some psychoactive ingredient.  While I believe that, based on a consideration of the language of 21 C.F.R. § 1308.11(f) in its context, it can be argued that plant life is not a "material," and that, therefore, the precatory language of the regulation does not adequately give fair notice that the khat plant itself is a controlled substance, I do not base my dissent on this contention.  I set it forth only to show that the first conclusion of the *Hussein* court is questionable, and to show why consideration of the *manner* in which the regulations are structured leads me to the vastly more important conclusion that the regulations dealing with cathinone and cathine are unconstitutional, the second issue considered in greater detail by the court in *Hussein*.

Apart from any linguistic question regarding the precatory language used in 21 C.F.R. § 1308.11(f) and in the other regulations, the fatal constitutional flaw is the omission of any mention of the khat plant when other plants are specifically listed in the regulations as being controlled substances.

The court in *Hussein* found "unpersuasive" the appellant's argument that, because the regulations list some plants but not the khat plant, the regulations do not comply with the due process requirement of fair warning.  The court found that the "pattern" was "at best, irregular." *Hussein,* 351 F.3d at 16.  It based this finding on the fact that Schedule I prohibits possession of psilocybin and psilocyn "but not their plant hosts (magic mushrooms)." *Id.*

> It is simply too much of a stretch to assume, on the basis of this limited pattern, that a person of ordinary intelligence would jump to the conclusion that, despite the clear prohibition on "material containing cathinone," khat containing cathinone is excluded from coverage.  This conclusion tracks the thinking of a clear majority of the state courts that have been confronted with similar problems.

*Id.*

The difficulty I have with a conclusion that due process exists in the present case because of a failure to include psilocybic mushrooms in the schedules is twofold.  First, for the very same reasons set forth earlier in this opinion, I believe that the failure to include the mushroom plants that contain psilocybin or psilocyn as controlled substances also constitutes a failure to comply with the due process requirement of fair notice.  The familiar adage that "two wrongs do not make a right" comes to mind.  Second, when dealing with the constitutional right to be fairly notified that to engage in certain conduct is a crime, I don't think it is "a stretch" to believe that persons of ordinary intelligence, seeing other plants specifically listed as being illegal, but not the khat plant, could reasonably conclude that they can lawfully possess the khat plant.[11]

---

[11]The court is aware that *Hussein* was followed in a conclusory manner by the Eighth Circuit in *United States v. Sheikh*, 367 F.3d 756 (8th Cir. 2004).

Finally, the *Hussein* court relied upon three state court mushroom cases for its decision.[12] I find the fourth case cited, *Fiske v. State of Florida*, 366 So.2d 423 (Fla. 1978), to be far more persuasive than the three state court cases relied upon by the First Circuit. The Florida statute in question in *Fiske* listed in its schedule of substances "any material which contains a quantity of the hallucinogenic substance 'psilocybin.'" *Id.* The court said:

> The statute makes no mention of psilocybic mushrooms or, for that matter, of any other psilocybic organic form that grows wild. If the statute were to specify that psilocybin was contained in certain identifiable mushrooms and were to name those mushrooms, thereby apprising a prospective defendant that possession of those mushrooms is unlawful, it would not be unconstitutional as applied. The statute as presently framed, however, gives no information as to what plants may contain psilocybin in its natural state. More particularly, the statute does not advise a person of ordinary and common intelligence that this substance is contained in a particular variety of mushroom. The statute, therefore, may not be applied constitutionally to appellant. It does not give fair warning that possession of the mushrooms possessed by appellant is a crime. See *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed. 2d 894 (1964); *State v. Winters*, 346 So.2d 991 (Fla. 1977).

*Fiske*, 366 So.2d at 424.

Furthermore, as the majority opinion correctly finds, "the term 'cathinone' is sufficiently obscure that persons of ordinary intelligence reading the controlled substances schedules probably would not discern that possession of khat constitutes possession of a controlled substance." As stated earlier, I am in complete agreement with this statement. The failure to include in the regulations the khat plant as a controlled substance itself (a seemingly logical inclusion) may stem from the fact that the Convention on Psychotropic Substances listed only cathinone and cathine as controlled substances, *infra*. But whatever the reason for the omission, the result is a failure to give fair warning to a person of ordinary intelligence that possession of the khat plant is unlawful, and hence a denial of the due process guaranteed by the Constitution.

### III.    *Persons Who Are Subject to the Regulations*

There is absolutely no evidence that the khat plant with its cathinone and cathine ingredients presented a significant problem to the population of the United States when the regulations in question were promulgated by the Drug Enforcement Administration ("DEA") of the Department of Justice. In 1986, the United Nations Commission on Narcotic Drugs included cathinone and cathine in the schedules of the Convention on Psychotropic Substances ("Convention"), to which the United States is a signatory. In 1987, the DEA Administrator found that cathinone and cathine "must be controlled under the CSA in order to meet the requirements imposed by the Convention on Psychotropic Substances." *Schedules of Controlled Substances; Placement of Cathinone and 2.5-Dimethoxy-4-ethylamphetamine (DOET) in Schedule I and Cathine, Fencamfamin, Tenproporex and Mefenorex in Schedule IV*, 52 Fed. Reg. 41736-01 (proposed Oct. 30, 1987). Article 22 of the Convention provides, in part, that "[s]ubject to its constitutional limitations, each Party shall treat as a punishable offense, when committed intentionally, any action contrary to a law or regulation adopted in pursuance of its obligations under this Convention. . . ." The DEA's inclusion of

---

[12]Those cases are *State v. Atley*, 564 N.W.2d 817 (Iowa 1997), *State v. Justice*, 704 P.2d 1012 (Kan. Ct. App. 1985), and *People v. Dunlap*, 442 N.E.2d 1379 (Ill. App. Ct. 1982).

cathinone and cathine as controlled substances because they are treated as controlled substances in the Convention's schedules[13] was clearly subject to this country's constitutional limitations, specifically the due process requirement of the Fifth and Fourteenth Amendments which mandates that fair warning be given to a person of ordinary intelligence regarding the conduct that is made criminal by the regulations.

According to the DEA, khat has been used since antiquity as a recreational and religious drug by natives of Eastern Africa, the Arabian Peninsula, and the Middle East. Khat is legal in many countries, and has long been an acceptable substitute for alcohol among Muslims. During the period of Ramadan, the use of khat is popular to alleviate fatigue and reduce hunger. Although khat can be abused, it is often used in a social context similar to the manner in which coffee is consumed in other parts of the world. While the amount of khat seized in the United States has been steadily increasing, the increase appears to be related to the increasing number of immigrants from Somalia, Ethiopia, Yemen, Eritrea, and other countries where khat use is common. It does not seem likely that khat use will expand beyond the ethnic Somalian, Ethiopian, Yemeni, and Eritrea communities. According to the DEA, there is no indication that khat is marketed outside these ethnic communities, although it appears to be readily available.[14]

While every person, regardless of nationality and ethnic background, is obviously subject to the controlled substances regulations, I believe it is nevertheless a relevant factor, when considering the due process requirement of fair notice, that the khat plant has had widespread acceptance as a recreational and religious drug by millions of people in a number of nations, primarily in Africa, the Arabian Peninsula and the Middle East, where its use has been an important part of the cultures of those areas for centuries. Immigrants understandably bring that culture with them when they enter the United States. While the regulations at issue present the same fair warning problem for everyone, they unquestionably severely impact those ethnic groups who traditionally use khat in the same manner as others in the United States use legal stimulants such as coffee and tobacco. The regulations, however, do not mention khat or serve in the slightest way to warn anyone that it is illegal to chew khat, make tea from khat, or possess khat for any purpose whatsoever, including recreational and religious purposes. They truly, in my opinion, constitute a trap for the innocent.[15]

IV.    *The Constitutional Violation Is Not Overcome By the Need to Prove Scienter*

It remains whether "the concern that a person of ordinary intelligence could unwittingly expose himself or herself to criminal penalties due to the vagueness of the controlled substances schedules with respect to khat is overcome here because . . . conviction requires a showing of actual knowledge that khat contains a controlled substance." I respectfully disagree with the majority's conclusion that the lack of fair warning is overcome by the requirement to prove scienter, *i.e.*, in this case, that the defendant knew that the khat plant contained a controlled substance.

---

[13] Although cathine was placed in Schedule III of the Convention, the DEA placed it in Schedule IV of the CSA.

[14] U.S. Drug Enforcement Administration, *Drug Intelligence Brief, Khat, June 2002.* http://www.usdoj.gov/dea/pubs/intel/02032/02032.html (accessed January 28, 2005).

[15] Justice Douglas in *United States v. Cardiff*, 344 U.S. 174, 176 (1952), finding that a section of the federal Food, Drug and Cosmetic Act made an act criminal "without fair and effective notice," said, "[w]ords which are vague and fluid . . . may be as much of a trap for the innocent as the ancient laws of Caligula." (citation omitted). The same can be said for the regulations. While not vague and fluid, they would lead a reasonably intelligent person to believe that the khat plant is *not* a controlled substance. They, therefore, constitute a trap for the innocent – an even more effective snare than that referred to by Justice Douglas.

It is, of course, true that certain statutes have been saved from a finding of unconstitutionality, due to a failure to give fair warning, by the fact that the statute in question required a specific intent to do the prohibited act. *Screws v. United States*, 325 U.S. 91 (1945), is often cited in defense of statutes challenged on the "void for vagueness" argument. The statute in question in *Screws* made it a crime for a person, under color of state law, to willfully deprive inhabitants "of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States."[16] Because of the nature of the legislation, the Court found that favoring the interpretation of legislation which supports its constitutionality "is impelling here so that if at all possible [the statute] may be allowed to serve its great purpose – the protection of the individual in his civil liberties." *Id.* at 98.

> We hesitate to say that when Congress sought to enforce the Fourteenth Amendment in this fashion it did a vain thing. We hesitate to conclude that for 80 years this effort of Congress, renewed several times, to protect the important rights of the individual guaranteed by the Fourteenth Amendment has been an idle gesture. Yet if the Act falls by reason of vagueness so far as due process of law is concerned, there would seem to be a similar lack of specificity when the privileges and immunities clause . . . and the equal protection clause . . . of the Fourteenth Amendment are involved. Only if no construction can save the Act from this claim of unconstitutionality are we willing to reach that result.

*Id.* at 100 (internal citations omitted).

The Court did not reach that very undesirable result. It instead avoided it by finding that the requirement of willfulness relieved the statute of the objection regarding vagueness.

> An analysis of the cases in which "willfully" has been held to connote more than an act which is voluntary or intentional would not prove helpful as each turns on its own peculiar facts. Those cases, however, make clear that if we construe "willfully" in § 20 as connoting a purpose to deprive a person of a specific constitutional right, we would introduce no innovation. The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning. . . . But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.

---

[16] The statute, 18 U.S.C. § 52, was the predecessor to the current 18 U.S.C. § 242.

*Id*. at 101-02 (internal citation omitted).

On the same basis, the Court, in the other cases cited in the majority opinion, upheld the constitutionality of a regulation requiring drivers of motor vehicles transporting inflammable liquids to avoid "so far as practicable, and, where feasible" driving into or through congested thoroughfares, *Boyce Motor Lines v. United States*, 342 U.S. 337, 339 (1952), and an ordinance requiring a business to obtain a license if it sells any items "designed or marketed for use with illegal cannabis or drugs." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 489 (1982).

The present case, however, does not fall in the group of cases in which the statute or regulation is subject to a void-for-vagueness attack.[17]  There is nothing vague in the listing of cathinone as a controlled substance.  The due process problem with this regulation is not a vagueness problem, but the *manner* in which the DEA has chosen to list controlled substances in the schedules.  While it has chosen to list some specific plants by their commonly known names as well as their psychoactive substances, it has chosen to list only the psychoactive substances found in the khat plant – substances that are not found in any mainstream dictionaries – and failed to include or mention in any way the khat plant.  A person of ordinary intelligence desiring to know whether it is illegal to chew khat during Ramadan or to join friends for a cup of khat tea would not find khat mentioned any place in the laws of the United States.  Worse yet, that person, examining the DEA's regulations could reasonably conclude that possession of khat – by reason of its omission from schedules that contain other plants – is *not* a crime.[18]

In my view, it is not enough to excuse this omission by the familiar recitation that while the drafters might have chosen clearer and more precise language, this does not mean that the poorly drafted regulation is unconstitutionally vague.  *Hussein,* 351 F.3d at 15 (quoting *United States v. Petrillo*, 332 U.S. 1, 7 (1947)).  The regulation in the present case is aimed at groups of immigrants from Somalia, Ethiopia, Yemen, Eritrea and other countries where use of the khat plant is an accepted and important part of the lifestyles of the people in those regions.  This regulation is not just poorly drafted.  It is placed in the context of regulations that would make persons of ordinary intelligence reasonably believe that they can lawfully possess the khat plant.  I find that the language of the Supreme Court in *Bouie v. City of Columbia*, 378 U.S. 347 (1963), is very pertinent to this regulation:

> When a statute on its face is vague or overbroad, it at least gives a
> potential defendant some notice, by virtue of this very characteristic,
> that a question may arise as to its coverage, and that it may be held
> to cover his contemplated conduct.  When a statute on its face is
> narrow and precise, however, it lulls the potential defendant into a
> false sense of security, giving him no reason even to suspect that
> conduct clearly outside the scope of the statute as written will be
> retroactively brought within it by an act of judicial construction.  If
> the Fourteenth Amendment is violated when a person is required "to
> speculate as to the meaning of penal statutes," as in *Lanzetta*, or to
> "guess at [the statute's] meaning and differ as to its application," as
> in *Connally*, the violation is that much greater when, because the

---

[17]The First Circuit in *Hussein* agreed that "[t]o the extent that statutory ambiguity is the linchpin of a fair warning challenge, this case does not fit the mold." *Hussein*, 351 F.3d at 15.

[18]Curing the constitutional defect of the regulations would be simple.  All that would be required to avoid any fair notice issue and, incidentally, improve the practical administration of the regulations, is to simply list the khat plant, along with the marihuana plant, the peyote plant, the poppy plant and the leaves of the coca plant, as a controlled substance.

> uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question.

*Id*. at 352.

Similarly, in the present case, because the regulation on its face is narrow and precise, it lulls a potential defendant into a false sense of security. The fact that the khat plant contains listed illegal psychoactive substances is not revealed to a person of ordinary intelligence until that person is arrested, indicted and endures a criminal prosecution based on the expert testimony of a DEA chemist.

While I appreciate the fact that "a scienter requirement may *mitigate* a law's *vagueness,* especially with respect to the adequacy of notice to the complainant that his conduct is proscribed," *Village of Hoffman Estates*, 455 U.S. at 499 (emphasis added), I don't believe that a scienter requirement serves to save any and all criminal statutes and regulations from being in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. Otherwise, the "constitutional vice" referred to in *Screws*, "the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives him no warning," 325 U.S. at 101, becomes virtually non-existent. I believe that due process issues require that each case be considered on its own unique facts, including not just the text of a regulation, but also the subject matter of that regulation and the persons who are targeted by its enactment. In this case, I seriously doubt that Mr. Caseer, who was indicted and burdened with the cost, both emotionally and financially, of a criminal trial and the fear of possibly being imprisoned, would appreciate the argument that his due process rights under the Constitution of the United States can be satisfied by requiring the government to prove at trial that he knew that the khat plant contained a controlled substance.

## V.    *Conclusion*

For the reasons stated, I believe that 21 C.F.R. § 1308.11(f)(3), listing cathinone as a Schedule I stimulant, and 21 C.F.R. § 1308.14(e)(1) listing cathine as a Schedule IV stimulant, do not provide fair notice to persons of ordinary intelligence that possession of the khat plant is a criminal offense. In my opinion, these regulations do not meet the due process requirements of the Fifth and Fourteenth Amendments, and I therefore respectfully dissent from the majority's conclusion to the contrary. I join Judge Moore, however, in finding that there was insufficient evidence to show that the defendant knew that the khat plant contained a controlled substance, and that the judgment of conviction consequently must be vacated.