NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
FILE NAME: 19A0215N.06

Case No. 18-5459

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JOYCE ENSLEY,

    *Plaintiff-Appellant*,

    v.

CHARLES WHOBREY, *et al.*,

    *Defendants-Appellees*.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Apr 25, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

Before: BATCHELDER, COOK, and KETHLEDGE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** This appeal arises under the Employee Retirement Income Security Act (ERISA), on a claim by plaintiff Joyce Ensley for surviving-spouse benefits that were denied by defendant Central States Southeast and Southwest Areas Pension Fund ("Fund") because Ensley and her late husband Melvin, the ERISA Plan participant, had previously elected to decline those benefits. In challenging the denial, Ensley claimed that Melvin forged her name on the form, but the district court held, among other things, that Ensley did not bring this suit within the applicable statute of limitations. We AFFIRM.

**I.**

In April 2002, Melvin executed a form titled "Election Notice Joint and 50% Surviving Spouse Option" that declined the surviving-spouse option offered in his pension plan. The surviving-spouse option would have given Ensley, after Melvin's death, a monthly benefit (at 50% of Melvin's benefit, as his surviving spouse) for the remainder of her life, but it would also have

reduced Melvin's monthly pension benefit during his lifetime. The Election Notice form contains signatures for both Melvin and Ensley, with notarization by a Patricia Wells.

When Melvin died in April 2009, the Fund informed Ensley that, pursuant to the Election Notice form, the monthly benefits would be discontinued. Ensley responded that she had never before seen the Election Notice form, did not sign it, and did not know Patricia Wells. The Fund explained that she could appeal the denial to the Benefit Claim Appeals Committee (BCAC), which would consider any evidence she submitted, such as a handwriting expert's opinion, but that she had the burden of proving that the signature was not hers.

On February 16, 2010, Ensley submitted to the BCAC a "Forensic Handwriting Report" from a woman named Marty Pearce, a certified document examiner. The Report stated that, based on the documents that Ensley had provided, both signatures on the Election Notice matched Melvin's handwriting, not Ensley's, so Ensley had not signed the Election Notice.

But on May 24, 2010, the BCAC sent Ensley a letter denying the appeal because the Report did not convince it that the signature on the Election Notice form was not Ensley's. The BCAC found the Report flawed and unpersuasive because it: (1) provided no specific reasons to support its conclusions; (2) had not used contemporaneous examples of Melvin's or Ensley's signatures from 2002 for its comparisons; (3) had used only select examples of Ensley's signature rather than a complete set of signature examples (such as all of her personal checks from 2002); and (4) revealed that Ensley's signature varied greatly, prompting the BCAC to say: "Although no member of the Committee is a handwriting expert, it was obvious to all that [Ensley is] not consistent in the manner in which [she] sign[s] [her] name–especially noticeable are the various ways in which [she] form[s] the letter 'y' in both [her] first and last names." The BCAC also gave credit to the notarization as proof that the signature was Ensley's. And the BCAC recognized that

the Fund had paid Melvin more than $37,000 in additional lifetime pension benefits because of the decision to forgo surviving spouse benefits. The Fund advised Ensley of her option to appeal further and that, if she appealed, she should investigate the notary ("[Y]ou should contact the notary and submit a copy of the notary's record regarding this attestation."), answer for Melvin's receipt of non-reduced monthly pension benefits, and describe her involvement in Melvin's retirement application process, including her efforts to ensure that any documents necessary to provide her with survivor's benefits had been properly signed and filed with the Fund.

Almost six months later, on November 16, 2010, Ensley's then-attorney, Martin Kooperman, told the Fund that Ensley was appealing the BCAC's decision, but did not address the concerns raised in the May 24, 2010 letter. The Fund responded on December 3, 2010, explaining that Ensley (Kooperman) had not addressed the BCAC's concerns, listing those concerns again and advising Ensley, again, to provide information about the notary, Melvin's receipt of non-reduced monthly pension benefits, and Ensley's efforts to ensure that the proper documents had been filed regarding survivor's benefits. The Fund also emphasized: "Please understand that the weight given to Ms. Pearce's expert [handwriting] opinion may be adversely affected by Ms. Ensley's failure to satisfactorily address all of the points raised by the [BCAC]" and "[t]herefore, Ms. Ensley should provide detailed responses to all of the above points."

By March 8, 2011—three months later—the Fund had received no response, so it contacted Kooperman, asking whether Ensley intended to provide the missing information and proceed with her appeal. On March 24, 2011, Kooperman responded that Ensley would be proceeding with her appeal and that "we are in the process of gathering information for this appeal and will submit the additional information as soon as possible." But the Fund heard nothing further from either Ensley or Kooperman for over two years.

On March 29, 2013, Ensley called the Fund and said that she wanted to pursue her appeal. But then the Fund heard nothing further from Ensley for another four months.

On July 30, 2013, the Fund wrote to Ensley, explaining again that if she wanted to reopen the appeal, she should submit the information requested in May 2010 and again in December 2010. This letter said: "Please understand that you bear the burden of proof in demonstrating any fact essential to the approval of your claim, and your failure to provide the information requested and/or fully address the Committee's observations may lead to inferences which are adverse and contrary to your claim." When Ensley did not respond by November 5, 2013, the Fund mailed the letter to her again. Ensley did not respond for three more years.

In August 2016, attorney Gina Crawley wrote to the Fund, stating that she represented Ensley and requesting copies of: (1) the documents the BCAC relied on in deciding Ensley's appeal; (2) all rules, procedures, contracts, or documents that would govern the Trustees' review; (3) "all rules and procedures that were in place in regards to verifying the authenticity of an Election Notice that would have been submitted to [the] Fund on or about April 15, 2002"; and (4) "proof of any other safeguards that [the] Fund had in place to minimize acting upon forged documents on or about April 15, 2002." On August 18, 2016, the Fund sent Crawley copies of its records of Ensley's prior appeal, the Plan documents, and the Plan Trust Agreement—which were the documents that ERISA required it to provide and the only documents it actually had.

On October 16, 2016, Crawley submitted a letter with attachments. Crawley argued that the February 2010 Forensic Handwriting Report by Marty Pearce was sufficient on its own to prove that Ensley did not sign the Election Notice. But Crawley did not address the BCAC's concerns that the Report did not provide reasons for its opinions, had not used contemporaneous handwriting samples of either Ensley or Melvin, had not used a complete set of Ensley's signature

examples, or that the examples of Ensley's signature that were included were inconsistent. Crawley also argued that because Melvin had handled the family finances, Ensley had just assumed the pension benefits would continue after his death—she had not reviewed the Election Notice and was made aware of it only after his death. Crawley explained that she could not provide a declaration from Patricia Wells because Wells had died in February 2004, but argued that Wells's notary commission was expired in 2002 when she "notarized" the Election Notice, meaning that Wells was not actually a notary and her "notarizing" the Election Notice was an illegal act. Crawley argued—with no citation to any legal authority—that Ensley could not be held responsible for Wells's illegally notarizing the Election Notice and that the Fund "was presumed to know that Ms. Wells' commission expired on November 27, 1999," so it must be held responsible for its accepting an invalid notarization and Election Notice.

The Trustees met two months later, on December 13, 2016, to consider the appeal. They determined that Ensley had not proven that the signature on the Election Notice was forged, so they denied her appeal. The Trustees emphasized the absence of contemporaneous signature examples from 2002 and that neither the Report nor Ensley herself had explained why the handwriting examination was not conducted using contemporaneous signatures. They offered to reconsider Ensley's appeal if she (1) explained the reasons for the six-year delay in pursuing the appeal and submitting the additional information, (2) submitted at least 20 known signature examples and other handwritten documents from 2002, and (3) obtained an updated expert report from a qualified document examiner that used the 2002 examples. Ensley did not reply—she did not submit any additional information or pursue reconsideration by the Trustees.

On April 25, 2017, Ensley sued in federal court seeking (1) benefits under Melvin's ERISA Plan and (2) a civil penalty for the Fund's alleged failure to provide requested information. The

Fund moved for judgment on the administrative record and argued that Ensley's ERISA claims were barred by the statute of limitations, that the decision was not arbitrary or capricious, and that the civil-penalty claim was untenable factually and legally.

The district court found that Ensley's legal claim began to accrue, at the latest, on May 24, 2010, when the BCAC denied her first appeal in writing (i.e., rejected the handwriting expert's Report), but that Ensley did not sue until April 25, 2017, well past Tennessee's six-year statute of limitations for contract actions. Ensley conceded the facial untimeliness but argued for equitable tolling, claiming that she had diligently pursued her rights but the Fund had caused the delay by demanding more information. The district court found that the record refuted this claim: Ensley had not been diligent and the Fund had not "demanded" additional information (it had attempted to aide Ensley by directing her to the information necessary to meet her burden and allowing her additional time and opportunity to provide it). Moreover, the court held that "the statute of limitations for bringing a legal action is not tolled during the administrative process." The court found the claim time barred.

The court also found that the Fund's decision was not arbitrary or capricious because Ensley had not carried her burden of proving that her signature was forged, "given the missing information and unanswered questions about Ms. Pearce's analysis" and Ensley's "failure to provide the information requested or address the concerns identified."

Finally, the district court denied Ensley's claim for statutory penalties for the Fund's alleged failure to produce certain requested information. The court found that ERISA does not require the information Ensley had requested, that the information she requested did not even exist (the Fund had not created it), and that Ensley was not a participant or beneficiary entitled to that information anyway. The court rejected the claim and denied the request for penalties.

Ensley moved the district court to alter or amend the judgment via Federal Rule of Civil Procedure 59(e), claiming that she had good cause for her delay (e.g., health issues, reliance on her former attorney, difficulty in locating the notary and the documents from 2002), that the Fund should be estopped from arguing statute of limitations, and that the Fund had waived the statute-of- limitations defense. The district court found Ensley's good-cause-for-delay argument neither new nor persuasive. As for the estoppel argument, the court said:

> [The Fund] did not raise the statute of limitations defense [in its December 2016 denial of her claim] because no lawsuit had been filed. [Ensley] continues to confuse the deadline for filing a lawsuit with any deadlines for her to file additional documentation during her administrative appeal.

As for the waiver argument, the court said:

> [Ensley] cites an Eleventh Circuit [] case for the proposition that the fiduciary statute of limitations defense is 'subject to express waiver.' The record here does not reveal any *express* waiver. [Ensley] also cites to the *dissent* in a Ninth Circuit [] case, decided under California law. A dissenting opinion from another circuit, decided under the law of another state, is not binding upon this court.

The court denied the motion. Ensley appeals.

## II.

Ensley claims the district court erred by dismissing the suit as untimely. We review this judgment de novo. *Patterson v. Chrysler Grp., LLC*, 845 F.3d 756, 762 (6th Cir. 2017).

Ensley concedes that she filed her lawsuit after the expiration of the applicable statute of limitations—Tennessee's six-year limit for contract actions—and argues instead for equitable tolling by claiming that she diligently pursued her claim and the Fund caused the delay by demanding information. But the record demonstrates that Ensley did *not* diligently pursue her claim. She repeatedly allowed significant time lapses between communications with the Fund, despite the Fund's efforts to engage her, prompt her to provide information, or determine if she was even still pursuing her claim. Moreover, the record also demonstrates that the Fund did not

*demand* information from her, unreasonably or otherwise. Rather, the Fund denied her claim and her first appeal, but then offered her the opportunity to salvage her claim and advised her on its questions or concerns so that she could most effectively (and expeditiously) do so.

Ensley next argues, using this same premise, that the Fund is estopped from invoking the statute of limitations because it "caused the delay by acting beyond the parameters of the Pension Plan" when it "refused to process Ms. Ensley's appeal in accordance with the Pension Plan." Ensley's theory is that the Fund "halt[ed] the appeal process" by "demanding" in its December 3, 2010 letter "that Ms. Ensley provide more information before it would permit the appeal to proceed" and because the Plan does not permit the Fund to halt the appeal process—rather, it requires the Fund to decide an appeal within 120 days—or to demand information from her, the Fund impermissibly "stop[ped] Ms. Ensley's appeal" and caused the delay. But this representation of events is neither complete nor accurate.

In the May 2010 letter, which rejected her first appeal, the Fund began: "At its May 20, 2010 meeting, the Benefits Claim Appeals Committee reviewed your claim, including the forensic handwriting report you submitted, and determined that you are not eligible to receive a 50% Surviving Spouse Benefit." That letter then explained the BCAC's reasons for its decision, advised Ensley that she could further appeal that decision to the Trustee Appellate Review Committee, and offered "recommendations" as to the information and documentation that would persuade the Trustee Appellate Review Committee to overrule the BCAC. Ensley's attorney, Kooperman, replied on November 16, 2010, with a three-paragraph letter, and attached documents, most notably the same forensic handwriting Report. The Fund answered with the December 2010 letter, which said in relevant part:

Dear Mr. Kooperman:

We have received Joyce Ensley's Pension Benefit Appeal Form [and] your November 16, 2010 letter and its exhibits. . . . You argue that 'Ms. Pearce's expert opinion should be sufficient to rebut any presumption that the election was signed by Joyce Ensley.'  However, you address none of the points raised in the Fund's May 24, 2010 letter communicating the [BCAC]'s observations. . . .

. . .

Please understand that the weight given to Ms. Pearce's expert opinion may be adversely affected by Ms. Ensley's failure to satisfactorily address all of the points raised by the Committee.

You also argue that the signatures on [the] election form were not properly notarized. . . . [A]lthough you submitted an e-mail indicating that Ms. Wells' commission expired on November 27, 1999, it is contradicted by the fact that she still possessed her seal, notarized the form, and indicated that her commission expires January 2004. Therefore, Ms. Ensley should contact Ms. Wells and submit her signed statement explaining the discrepancy, together with the information requested in the Fund's May 24, 2010 letter concerning the notarization. . . .

. . .

Although you indicate that Melvin Ensley was in charge of all of the family's business matters, it appears that Joyce Ensley had her own checking account with Bank of America.  Your letter also states, 'Mrs. Ensley was aware that there were survivor benefits that she would receive upon her husband's death.' However, you do not fully explain either the extent or the basis for her understanding or address many of the points raised in our May 24, 2010 letter concerning her involvement in her husband's retirement process. . . .

. . .

Therefore, Ms. Ensley should provide detailed responses to all of the above points.

Once we receive the above requested information and documentation, we will schedule Ms. Ensley's appeal for review by the Trustee Appellate Review Committee.

If you or Ms. Ensley have any questions, please call me. . . .

Two things from this passage bear emphasis: (1) in both its tone and its repeated use of the word *should*, such as in the conclusion that "Ms. Ensley *should* provide detailed responses to all of the above points" (emphasis added), this letter is *not* a *demand* for information; and (2) while the letter certainly indicates that the Fund will delay the appeal to the Trustee Appellate Review Committee until "we receive the above requested information and documentation," that delay was for Ensley's

benefit, as she could not have won her appeal based on the information and documentation then in the record.

When Kooperman did not timely respond, the Fund prompted him again three months later, writing on March 8, 2011:

> Dear Mr. Kooperman:
>
> We have received no response to our December 3, 2010 letter from either you or Ms. Ensley. . . . Please advise me whether Ms. Ensley intends to proceed with her appeal; and if so, when she expects to submit the information and documentation requested in our December 3, 2010 letter. If Ms. Ensley has decided to withdraw her appeal, please let me know.
>
> If either you or Ms. Ensley have any questions, please call me. . . .

Kooperman responded on March 24, 2011, and asserted that Ensley would be proceeding with her appeal and that "we are in the process of gathering information for this appeal and will submit the additional information as soon as possible." At this point, the Fund was merely waiting for Ensley (or Kooperman) to provide the information, as promised. But Ensley did not make another submission until October 2016.

Nothing in this record supports the contention that the Fund caused the delay of more than six years by demanding that Ensley provide more information before it would proceed. The Fund responded promptly to every communication—written or by telephone—from Ensley. Moreover, the Fund did not *demand* information; it suggested information that Ensley *should* provide that would most effectively help her prove her claim. Finally, the Fund did not *require* this information before proceeding with the appeal, as is evident from the fact that Ensley *never* submitted much of this information but the Trustees eventually (December 13, 2016) ruled on her appeal. Ensley could have responded at any time with a request that the Trustees decide her appeal based on the record then before them. She never did so.

Oddly, Ensley next argues that she "had neither actual [n]or constructive notice of the six (6) year statute of limitations." On one hand, this is a perplexing statement from Ensley's counsel that she does not know the law. On the other hand, this argument is dead on arrival inasmuch as ignorance of the law is no excuse. *See*, *e.g.*, *United States v. Caseer*, 399 F.3d 828, 835 (6th Cir. 2005); *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971).

Ensley also claims that she could not file her lawsuit until she had exhausted her administrative remedies, citing *Patterson v. Chrysler Group, LLC*, 845 F.3d 756, 764 n.7 (6th Cir. 2017). This theory, however, presupposes three things that are doubtful, unproven, or untrue: (1) that "exhaustion" required the completion of her second appeal, to the Trustee Appellate Review Committee, rather than just the "formal denial" after her first appeal to the BCAC; (2) that the Fund, rather than Ensley, caused the delay in completing the second appeal; and (3) that *Patterson*, which "explicitly rejected the argument that a claim accrues only upon exhaustion of administrative remedies," *id.*, actually supports her attempt to evade the statute of limitations. Based on these three counter-points, we must reject Ensley's exhaustion argument.

Finally, Ensley argues that the Fund "waived" a statute-of-limitations defense "because it did not raise the issue in its December 19, 2016 denial letter." But, as the district court explained, the December 2016 denial letter was part of the administrative appeal; the Fund "did not raise the statute of limitations defense then because no lawsuit had been filed." Ensley "continues to confuse the deadline for filing a lawsuit with any deadlines for her to file additional documentation during her administrative appeal."

Because Ensley has failed to prove that she is entitled to equitable tolling and because it is undisputed that she filed her lawsuit after the expiration of Tennessee's six-year statute of limitations for contract actions, this claim is untimely. The district court properly dismissed it.

### III.

For all of the foregoing reasons, we AFFIRM the judgment of the district court.